31 S.W.3d 64 (2000)
In the Interest of D.L.M., a minor child.
No. ED 76545.
Missouri Court of Appeals, Eastern District, Division One.
August 15, 2000.
Motion for Rehearing and/or Transfer Denied October 25, 2000.
Application for Transfer Denied December 5, 2000.
*65 Leigh Joy Carson, Clayton, for Appellant.
Cynthia Harcourt-Hearring, Margaret Donnelly, Guardian ad Litem, Clayton, for Respondent.
Motion for Rehearing and/or Transfer to Supreme Court Denied October 25, 2000.
PAUL J. SIMON, Judge.
Mother appeals the judgment of the trial court terminating her parental rights to D.L.M., her minor child. On appeal, mother essentially contends that the trial court erred in: 1) that its judgment was against the weight of the evidence because insufficient evidence was presented to support a finding by clear, cogent and convincing evidence that grounds for termination existed under either Section 211.447.4(2) RSMo 1994 (all further references herein shall be to RSMo 1994, unless otherwise noted) or Section 211.447.4(3); 2) its determination that it was in the best interests of *66 D.L.M. for mother's parental rights to be terminated pursuant to Section 211.447.6; and 3) failing to allow evidence concerning an alleged alteration of Division of Family Services Records by case manager John Carthan. Father did not respond and did not appeal the termination of his parental rights. We reverse judgment as to mother only and affirm the judgment in all other respects.
D.L.M., a female child born out of wedlock on October 1, 1991, has been under the jurisdiction of the Family Court since March 22, 1993. On February 17, 1993, Juvenile Officer Raymond J. Grush filed a petition in the Circuit Court of St. Charles County Missouri, alleging:
Pursuant to Section 211.031 RSMo, [D.L.M.] is in need of the care and treatment of this Court in that on or about January 25, 1993 in Saint Charles County, Missouri the juvenile was otherwise without proper care, custody or support in that the natural mother legally responsible for the care, custody and support of said juvenile was taken into protective custody due to her mental state and admitted into Malcolm Bliss State Hospital and the natural mother was otherwise unable to provide proper care, custody or support for said juvenile and could not recommend a suitable custodian for the juvenile in violation of Section 211.031.1(1)(b) RSMo, which is contrary to and in violation of the Juvenile Code.
Following a transfer of jurisdiction to the Family Court of St. Louis County, the judge entered Judgment on March 20, 1993, finding the allegations alleged in the petition to be true. On June 22, 1993, a dispositional hearing was held and custody of D.L.M. was placed with the Division of Family Services ("DFS"). Mother was given visitation rights subject to arrangement and approval by DFS and until January 3, 1997, D.L.M. resided with foster parents.
In July of 1995, mother commenced litigation against John Carthan, a case manager at Larson & Associates. Mother alleged that Mr. Carthan had blackmailed her into performing sexual acts for him and following orders from him by threatening to take away mother's housing and her daughter, D.L.M. She alleged that, in order to fulfill this threat, Mr. Carthan "hotlined" her several times. She filed an action against Mr. Carthan and it was settled prior to jury deliberations for $1,000,000.00. Mother also filed an action against her therapist for the therapist's alleged failure to believe mother's reports of Mr. Carthan's mistreatment. That case was settled for $165,000.00.
On March 3, 1996, the judge ruled that the allegations filed in prior petition to terminate the parental rights of mother were not proven by clear, cogent and convincing evidence and dismissed the petition. Following a review hearing, the Court continued its jurisdiction over D.L.M. and she remained in foster care.
On January 3, 1997, mother was granted physical custody of D.L.M. as a result of her substantial compliance with a DFS service plan. Mother was ordered to continue to receive psychiatric care and to take her medication as prescribed.
On March 6, 1997, mother had to be hospitalized for her mental illness, schizophrenia, as a result of her failure to take her medications. Mother had been delusional and hallucinating. D.L.M. was placed briefly in the custody of her maternal grandmother and then returned to mother.
On February 20, 1998, D.L.M. was removed from mother's home following mother's admission of using cocaine on several occasions between November 27, 1997 and February 15, 1998, her failure to take her psychiatric medications, and an assault at her residence in both January and February of 1998. D.L.M. stayed with her maternal grandmother. On April 20, 1998, the family court placed D.L.M. in the physical custody of D.L.M.'s foster parents, with whom she remained through *67 the 1999 trial which is the subject of this appeal.
Mother entered into another service plan on August 20, 1998. On September 16, 1998, mother was ordered to pay support and maintenance for D.L.M. in the amount of $300.00 per month and she complied.
From December 8 through December 18, 1998, mother was hospitalized once more. Once again, she had failed to take her medication and was delusional and hallucinating. She notified her caseworker, and checked herself into the hospital.
A petition to terminate mother's parental rights was filed on December 17, 1998. At that time, D.L.M. was under the jurisdiction of the family court pursuant to a series of orders originating in 1993. The allegations of the petition were that (a) D.L.M. had been adjudicated abused or neglected by the family court on June 22, 1993; (b) D.L.M. had been under the jurisdiction of the family court on a continuous basis for more than a year, the conditions that led to the assumption of jurisdiction still existed, and conditions of a potentially harmful nature existed such that there was little likelihood that the conditions could be remedied at an early date so that D.L.M. could be returned to the mother in the near future; and (c) the continuation of the parent-child relationship greatly diminished D.L.M.'s prospects for early integration into a stable and permanent home.
Based on the evidence adduced at the hearing, the trial court entered a judgment terminating mother's and father's parental rights pursuant to Section 211.447. The trial court made extensive findings of fact and conclusions of law finding that there was clear, cogent and convincing evidence that: mother suffered from an irreversible mental condition which, during periods of "decompensation," rendered her unable to knowingly provide D.L.M. with necessary care, custody and control; mother suffered from a chemical dependency but that said dependency did not prevent her from providing D.L.M. with necessary care, custody, and control; there was no evidence of any severe or recurrent acts of physical, emotional or sexual abuse toward the child; and mother repeatedly and continuously failed, although physically and financially able, to provide D.L.M. with adequate food, clothing, shelter or other care and control necessary for D.L.M.'s physical, mental or emotional health and development with the exception of the period of time that D.L.M. was placed in the custody of mother and the period of time following the entry of the financial order on September 16, 1998. The court further found that D.L.M. had been continuously under the jurisdiction of the family court since March 22, 1993, for a period of over one year, and that the continuation of the parent/child relationship greatly diminished the child's prospects of early integration into a stable and permanent home. Finally, the trial court determined that: D.L.M. had significant emotional ties to mother, but continuation of said ties would deprive the child of the permanency she deserved; mother maintained regular visits or other contacts with D.L.M., but that said visitation and contact failed to result in permanent reunification between mother and D.L.M.; mother contributed to the costs of care and maintenance for the child following the entry of the financial order on September 16, 1998 and during the period the child was in mother's custody, but mother failed to otherwise contribute to said costs; there was reasonable cause to believe that additional services were unlikely to bring a lasting adjustment by mother so as to return the child to her within an ascertainable period of time; mother, although interested in the child, lacked the ability to adequately commit to the child such that reunification on a permanent basis could be achieved; and, finally, it was in the best interests and welfare of D.L.M. that the parental rights of mother be terminated. D.L.M.'s father failed to appear and/or to file a responsive pleading. Mother's Motion to Alter and for Stay of Termination of Parental Rights was denied.
*68 In a termination of parental rights proceeding, the judgment of the trial court shall be affirmed unless it is unsupported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. In the Interest of F.N.M., 951 S.W.2d 702, 703 (Mo.App. E.D.1997). We defer to the trial court's assessment of the credibility of the witnesses and examine all facts in the light most favorable to the trial court's judgment. Id.
Prior to terminating the rights of a parent, there must be clear, cogent, and convincing evidence that one or more of the grounds set forth in Sections 211.447.2, 211.447.3, or 211.447.4, exists. Section 211.447.5. Id at 705. Although reunification of the family is the desired outcome of DFS involvement, the primary concern in any termination case is the best interest of the child. Id. at 706. Such clear, cogent, and convincing evidence must instantly tilt the scale in the affirmative when weighed against the evidence in opposition and leave the fact finder's mind with an abiding conviction that the evidence is true. In Re Adoption of W.B.L., 681 S.W.2d, 452, 454 (Mo. banc 1984). The statutes are to be strictly construed in favor of the natural parents. Id. at 455.
In her first point on appeal, mother contends the trial court erred because its judgment was against the weight of the evidence and contrary to existing law in that pursuant to Section 211.447.4(2) or Section 211.447.4(3); that there was not clear, cogent and convincing evidence to establish that: 1) D.L.M. had been abused or neglected; 2) the conditions that led to the assumption of jurisdiction over D.L.M. or conditions of a potentially harmful nature continued to exist and there was little likelihood that those conditions would be remedied at an early date so that D.L.M. could be returned to mother; or that continuation of the mother-child relationship would greatly diminish D.L.M.'s prospects of integration into a stable and permanent home.
Section 211.447.4(2) provides that a juvenile officer may file a petition to terminate parental rights when it appears that the child has been abused or neglected. Further, it provides that in determining whether to terminate parental rights under this section, the court must consider and make findings on four factors, namely: (a) a mental condition shown to be either permanent or such that there is no reasonable likelihood of its reversal and which renders the parent unable to knowingly provide necessary care, custody and control of the child; (b) a chemical dependency preventing the parent from consistently providing necessary care, custody and control of the child and which cannot be treated to enable such care, custody, and control; (c) a severe act or recurrent acts of physical, emotional or sexual abuse toward the child under circumstances indicating that the parent knew or should have known of such acts; and (d) a repeated or continuous failure by the parent, although able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control "...necessary for the child's physical, mental, or emotional health and development." Section 211.447.4(2)(a), (b), (c) and (d).
As to the first factor, the trial court found that mother suffered from a mental condition which could not be reversed and which rendered her unable to knowingly provide necessary care to her child. In support of this conclusion, the trial court asserted that mother suffered from Schizophrenia, Schizo-Affective Type, and was taking six different medications to control the mental condition. The court stated that the evidence further showed that mother was hospitalized from December 8, 1998, through December 18, 1998, due to a destabilization of her mental condition and a failure to take her medications. The court concluded that, when mother's mental condition "decompensates," she is unable to adequately care for her child.
*69 It is not disputed that mother suffers from Schizophrenia, Schizo-Affective type. The psychiatrist testified that schizophrenia is a permanent condition that cannot be eliminated, saying "It can be controlled or  managed or controlled but you cannot get rid of it. There's no cure."
Both the doctor and Pamela Leeper, a social worker, testified that mother was on the medications Loxitane and Risperdal, which are antipsychotics; Cogentin, to minimize side affects; Valium, for chronic anxiety; Paxil, for depression and Ambien, a hypnotic or sleeping pill. The trial court's determination that mother was taking these six medications to control her schizophrenia, as was implied in the judgment, is not entirely accurate. In addition to suffering from schizophrenia, mother suffers from depression. Some of the medications taken by mother are for depression. The evidence indicates that mother's depression stemmed from stress caused by the litigation process. Kathleen Williams, a social worker, testified: "Every time I have dealt with [mother] around the times she's been depressed the theme and issues have been around the possibility of losing her daughter." The doctor, when asked why mother was depressed and needed to be placed on antidepressants, stated: "I believe the pressure of the legal problem[s] that were going on besides custody, and there were some other cases that she was fighting, you know, in the courts and depositions, and...the pressure related to [all, I think, has gotten] her depressed."
The record shows that mother was hospitalized not only from December 8 through December 18, 1998, but also on March 6, 1997. Both hospitalizations resulted from the failure of mother to take her medications and her subsequent destabilization. The doctor testified that at the times mother was hospitalized, her condition was such that she would not have been able to take care of her children. However, the evidence shows that mother voluntarily hospitalized herself on both of these occasions, and that on at least one of these occasions, mother dropped her children off at D.L.M.'s maternal grandmother's house prior to hospitalizing herself.
Furthermore, the evidence shows that mother has a history of calling for help when facing her mental illness related problems. Barbara Taylor, a social worker, testified that mother voluntarily admitted herself to the hospital on March 6, 1997. Ms. Taylor stated that "...on the phone when she had called she had said something about needing some help, that she didn't have some of her medications, that they had disappeared from her apartment." She further stated: "[Mother] called us. [Mother] initiated the phone call to say that she needed some help."
Pamela Leeper testified that: "Usually if [mother] is having a hard day or a hard time or is feeling an increase  you know, just stress can also increase a person's symptoms even if they are on medication, so if she was feeling really stressed and her symptoms were going up she has a long history of making that call. She'll call me, she'll call my supervisor, she'll call the therapist, she'll call family members. She'll seek help."
A psychiatrist testified that prior to the March 1997 hospitalization, mother left her children, D.L.M. and T.M., at D.L.M.'s maternal grandmother's house and then voluntarily hospitalized herself.
The psychiatrist, when asked about mother's general ability to take care of herself, testified: "If she's very compliant with the medications she can take good care of herself."
Mother's failure to take medication and subsequent hospitalizations occurred two times in six years and, on both of these occasions, mother voluntarily hospitalized herself. "Unlike neglect, abandonment, abuse, or nonsupport, the mental illness of a parent is not per se harmful to a child." In the Interest of C.P.B., 641 S.W.2d 456, 460 (Mo.App.1982). Termination of parental rights should not be granted on account of mental illness unless *70 it is shown by clear, cogent and convincing evidence that D.L.M. is harmed or is likely to be harmed in the future. Id. The focus should be on the ability of mother to care for D.L.M. and her ability to maintain a parental relationship with D.L.M. which would not be harmful to her. The periods during which mother was hospitalized were the periods during which she was unable to care for her children. On at least one occasion, her child was safe with her maternal grandmother. There is no evidence that D.L.M. has been harmed or is likely to be harmed. Section 211.447.2(2)(h) as found in In the Interest of C.P.B. has been amended to provide "mental condition...which renders the parent unable to knowingly provide the child the necessary care, custody and control;" See Section 211.447.2(2)(a). Although the wording has been changed the basic purpose and intent of the section is essentially the same as it was formerly written and focuses on the primary concern of our juvenile code, the best interests of the child. We conclude that the trial court's finding as to the first factor was not supported by clear, cogent, and convincing evidence.
The trial court found that mother suffered from a chemical dependency, but that she successfully completed a substance abuse treatment program in August of 1998 and had participated in and completed one or more substance abuse treatment programs, but that she later relapsed and used cocaine following such treatment. The trial court concluded that: "Said chemical dependency does not presently prevent her from consistently providing the necessary care, custody and control for the child." As this conclusion is supported by substantial evidence, we agree with the trial court's determination that mother's past drug use is presently a non-issue.
Further, we do not disagree with the trial court's finding that there was no evidence of the commission of any severe or recurrent act of physical, emotional or sexual abuse of D.L.M.
Finally, the trial court determined that mother repeatedly and continuously failed, although physically or financially able, to provide the child with adequate food, clothing, shelter or other care and control necessary for the child's development, with the exception of the time D.L.M. spent in the physical custody of her mother and following the September 16, 1998 financial order. The trial court further found that the evidence showed that mother provided some clothing and toys for the child.
There is no dispute that mother provided adequate care for D.L.M. when the child resided with her and following the September 16, 1998 financial order, nor that mother purchased some clothing and toys for the child. Mother argues that there is no evidence of her failing to provide food, clothing, or shelter for D.L.M. The record lacks clear, cogent, and convincing evidence to show that the mother failed to pay support for the child. When asked if she knew of the mother's payment of child support, Julie Fakes responded, in reference to 1998: "To my knowledge she has paid November's payment through February." This statement does not clearly indicate that mother failed to support the child at other times.
Section 211.447.4(3) provides that a juvenile officer may file a petition to terminate parental rights when "the child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home." In making its determination, the trial court is to consider and make findings on four factors, namely: (a) the extent to which the parent has complied with any service plan or plans entered into; (b) the success or failure of the efforts of any agency, division, *71 or officer, to aid the parent on a continuing basis in adjusting his or her circumstances or conduct in order to provide a proper home for the child; (c) a mental condition shown to be permanent or such that there is no reasonable likelihood of its reversal and which renders the parent unable to knowingly provide the child with necessary care; and (d) any chemical dependency preventing the parent from consistently providing the child with necessary care, custody and control and which cannot be treated to enable the parent to consistently provide such care, custody and control.
Since D.L.M. has been continuously under the jurisdiction of the Family Court since March 22, 1993, a period of more than one year, the trial court found that the continuation of the parent/child relationship greatly diminished D.L.M.'s prospects for early integration into a stable and permanent home.
The trial court concluded that the evidence indicated that between July 25, 1996 and January 3, 1997, mother complied with the service plan then in effect to a sufficient degree, which resulted in the return of physical custody of D.L.M. to mother on February 20, 1998. The trial court then stated:
[Mother] relapsed and used cocaine during the time that the child was in her physical custody which resulted in the removal of [D.L.M.] on or about February 20, 1998. The court further finds that between August 18, 1998 through April 28, 1999, [mother] substantially complied with the terms of the service agreement in effect, but that her efforts and those of the [DFS] have proved unsuccessful in providing a continuing relationship between [mother] and [D.L.M.], despite reasonable, continuing and diligent efforts by the [DFS]. The representatives of the [DFS] made reasonable efforts to fulfill their responsibilities under the plan.
The trial court's determination that mother's efforts and those of the DFS have proven unsuccessful in providing a continuing relationship between mother and D.L.M. is not supported by substantial evidence. Susan Porter, a self-employed therapist, testified: "I think [D.L.M.] loves her mother and I think [mother] loves her daughter." Ms. Porter, as well as Kathleen Williams, a social worker, testified that mother was not disinterested in D.L.M. and did not lack commitment to D.L.M. DFS worker Julie Anich testified that mother was interested in D.L.M. Pamela Leeper answered affirmatively when asked if mother had significant emotional ties to D.L.M. D.L.M.'s foster mother, when asked if D.L.M. expressed good feelings about visits with mother, responded: "I think she looked forward to her visits with [mother]." CASA representative, Roxanne Putney, testified: "...the interaction between [D.L.M.] and [mother] is very good." When asked if the two were bonded to each other, Ms. Putney responded: "Absolutely." When asked if D.L.M. would be best served by remaining with mother, Dr. Wolfgram, a psychiatrist, responded: "I'm of that opinion." The foregoing testimony, coupled with the trial court's finding that mother complied with the terms of the service plans, support the conclusion that there has, in fact, been a continuing and close relationship between mother and D.L.M.
Mother has made repeated efforts to regain custody of her daughter, has complied with the DFS service plans, and has a strong bond with her daughter. The trial court's decision to terminate mother's parental rights is not supported by clear, cogent and convincing evidence. As a result of our disposition of point one, we need not address points two and three.
Judgment reversed as to mother only and judgment affirmed in all other respects.
GARY M. GAERTNER, P.J. and JAMES R. DOWD, J., concur.