Sheila L. McCALLISTER, n/k/a
Sheila L. Stark, Appellant,

v.

Timothy McCALLISTER, Respondent.

No. ED 77965.

Missouri Court of Appeals,
Eastern District,
Division Four.

Aug. 7, 2001.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 4, 2001.

Michael A. Gross, St. Louis, for appellant.

Jane E. Tomich, St. Charles, for respondent.

PAUL J. SIMON, Judge.

Sheila L. McCallister, n/k/a Sheila L. Stark (Mother), appeals the judgment of the Circuit Court of St. Charles County transferring primary custody of the parties' two younger children to Timothy McCallister (Father).

On appeal, Mother contends the trial court erred by: 1) transferring custody

because the findings upon which the trial court based its order are not supported by substantial evidence and are against the weight of the evidence and the best interests of the children in that there was overwhelming evidence that (a) Mother encouraged the children to maintain a relationship with Father and required them to participate in counseling and visitation with him, (b) Father alienated the children by antagonizing and abusing the oldest child and excluding him from visitation with the younger children, continuously criticizing Mother and behaving abusively toward the younger children, (c) the court-appointed counselor had subverted the therapy process by immediately excluding the oldest child from counseling sessions and refusing to take account of the children's feelings and concerns about past mistreatment by Father and (d) there was no substantial evidence that Mother interfered with the counseling process or engaged in conduct intended or likely to alienate the younger children from Father; and 2) ordering mother to pay a portion of Father's attorney fees because the order was clearly against the logic of the circumstances and so unreasonable as to shock one's sense of justice in that Father enjoyed a substantially greater income than Mother, he bore a substantially greater responsibility for the necessity of this litigation and the order effectively required Mother to pay all of the attorney fees incurred by both parties throughout the litigation. Judgment affirmed in part and reversed and remanded in part.

We will sustain the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence or it erroneously declares or misapplies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.banc 1976). We should exercise the power to set aside the judgment on the ground that it is against the weight of the evidence with caution and with a firm belief that the judgment is wrong. *Id.* Further, we defer to the trial court's assessment of the credibility of the witnesses and examine all facts in the light most favorable to the trial court's judgment. *In the Interest of D.L.M.*, 31 S.W.3d 64, 68 (Mo.App. E.D. 2000).

On October 12, 1995, the marriage between Father and Mother was dissolved. Mother was awarded primary custody of the parties' three children, Christopher (born March 11, 1980), Morgan (born November 11, 1982) and Cody (born July 27, 1984). Father was awarded reasonable visitation and temporary custody and was ordered to pay child support in the amount of $77.00 per week.

On July 1, 1997, Mother filed a motion for contempt against Father alleging, among other allegations, that Father failed to provide child support payments since the time of dissolution. On August 5, 1997, Father filed a cross-motion for contempt against mother alleging, among other allegations, that she refused to allow Father to exercise his rights of visitation and temporary custody. In addition, he filed a motion to abate child support alleging that he was current in all child support payments and that Mother failed to provide visitation and temporary custody to Father.

On April 16, 1998, the trial court entered a consent judgment providing, in pertinent part, that: 1) after all credits and "set offs," Father owes Mother the sum of $2881.00 as back child support; 2) the parties agree to keep each other informed as to schooling, sport and social activities of the children as well as any medical problems or expenses associated with the children, and Father may obtain school reports directly from the school; 3) the parties and the children must attend coun-

seling at a time, place and frequency determined by the counselor, who shall be agreed upon from a list of covered or acceptable counselors, and the parties and children are ordered to immediately set up appointments with the counselor to initiate the counseling process; and 4) the parties shall meet at 10:00 a.m. on April 25, 1998, at Fox Photo, and Mother shall bring all photographs and videos of the children in order for Father to pick the items he wants copied.

On January 22, 1999, Father filed a three-count motion: 1) for contempt (Count I); 2) for a declaration of emancipation with regard to Christopher (Count II); and 3) to abate child support for the three children (Count III). In his motion for contempt, Father alleged that Mother did not comply with the consent judgment in that she failed to: 1) keep Father informed as to the children's schooling, sports and social activities, medical problems and expenses; 2) refused to attend or to take the children to counseling at a time, place and frequency determined by the counselor; 3) refused to allow Father to copy the photographs and videos of the children; and 4) used a "non-PPO (plan approved)" doctor for medical treatment for the children. In Father's prayer for relief, he asked the trial court to punish Mother for contempt by incarcerating her for a time sufficient to compel her to comply with the court order as well as to grant Father his attorney fees, court costs and for other orders the court may deem just and proper.

In Mother's answer to Father's motion for contempt, she denied all of the allegations and specifically countered the allegations regarding therapy. Mother asserted that she and the children had gone to therapy on one occasion and that the children went on their own with Father on one occasion. Further, she claimed that the counseling was to determine whether Mother or Father was at fault for the children not wanting to visit Father, and the counselor indicated to Mother that she could determine this from the parties' previous "psychologicals," which were provided by Mother. Mother also filed a cross-motion for contempt and a motion to modify child support, both of which were denied and are not issues on appeal.

As to Father's motion for declaration of emancipation regarding Christopher, he asserted that Christopher was over the age of eighteen and, to the best of Father's knowledge, was not attending college on a full-time basis. He further alleged that Mother failed and refused to provide him with college transcripts indicating the classes in which Christopher enrolled in the fall semester of 1998, his grades and credits received for each course and the courses in which he enrolled in the upcoming spring 1999 semester. Mother denied Father's allegations, but admitted that Christopher, while still attending college, did not complete the statutorily required twelve hours and, thus, agreed that the trial court may enter an order declaring Christopher emancipated.

In Father's motion to abate child support, he alleged that, while he was current in all child support payments, Mother refused to allow him to exercise his specific rights of visitation and temporary custody without good cause. Mother denied the allegations and stated affirmatively that she had never refused to allow the children to go with Father on any occasion that he requested visitation. She alleged that Father's actions, statements and behavior toward the children resulted in the children not wanting to visit Father. In addition, she asserted that Father specifically told the children that he did not want them to visit him until their attitude changed.

On May 4, 1999, the trial court found, as to Count II, that Christopher was emancipated as of September 2, 1998. As to the motions for contempt and child support, the hearing began on January 31, 2000. In viewing the facts in a light most favorable to the judgment, the record reveals: Father attempted his first visitation with the three children in October 1995. He had made arrangements to pick up Christopher from a school football game and to bring him to his house to join Morgan and Cody. Father arrived at the school late, and a vocal altercation between Christopher and him ensued. By the time the two arrived at Father's house, Christopher was very agitated and became physically aggressive. Father ordered him to go to his room repeatedly, and when Christopher persistently refused, Father called the police, and the police took Christopher home. Morgan and Cody remained at Father's house but were "disobedient" for the rest of the time that they were there. On the next visitation, Father and Cody picked up Morgan from her basketball game, and an explosive argument between Father and the two children ensued. Further, Father testified that the children were "stealing" personal effects he bought for them to use at his home, such as clothing and stereos, which they would take to Mother's but never return. At that point, Father decided to terminate visitation until the family received counseling.

Father testified that, between December 1995 and April 1998, he made no attempts to exercise his visitation rights with the children. Although, at one point during direct examination, when asked why he did not request visitation during this time period, he stated that the children refused to go with him on approximately two occasions "up to April of 1998." He further testified that he called the children on special occasions, which included Christ-

mas and their birthdays, and sent birthday cards with money. Father stated that when he attempted to contact the children by telephone he generally did not get through, and on the occasions that he did talk to them they put him on speakerphone. He stated that at those times he could usually hear Mother's voice in the background and concluded that she was coaching the children, although he could not hear what she was saying.

Father testified that in September 1996, he sent a letter to Mother asking for information concerning the children's "activities, school events, sporting activities, plays, stuff like that" so that he could attend. However, he did not receive a response. He also stated that he sent a letter to Mother in October 1996, asking to be a part of any counseling the children may have been undergoing at the time, although he subsequently discovered that they were not in therapy, and received no response from Mother.

Moreover, Father testified that sometime in 1996, Christopher broke his arm, but Father did not receive any notice of this until 1998, when he obtained his credit report which indicated that Mother had taken Christopher to the doctor. When asked on direct examination whether Mother ever contacted him about the broken arm, Father replied, "She did not. [Mother] has never contacted me for anything in this time. In fact, when I asked for [Mother], my children will not let me speak to her. They say, 'Mom doesn't want to talk to you.'" Father also testified that a few days before the hearing, he discovered, through other sources and not Mother, that Morgan had been hospitalized in order to remove a piece of glass from her foot. He further testified that Mother transferred Morgan and Cody from their Father's school district to another without telling him. He sent addi-

tional letters in November 1996, January 1997, April 1997 and July 1997, requesting information on the children's events and schooling but received no response.

In April 1998, Mother and Father met in order for Father to copy photographs and videos of the children, pursuant to the 1998 consent judgment. Father testified that Mother did not comply with the order in that she merely gave him the "throwaway pictures" of the children when they were younger and no videos. In June 1998, Father invited the children to attend a Father's Day party which was held at his house. After initially refusing to go, the three children arrived that morning, handed him a card and left shortly thereafter. Further, at Christopher's high school graduation, the children would not make eye contact with their father and "wouldn't even really answer questions, or good-bye or anything."

In the meantime, Father was also attempting to initiate the counseling process by meeting with Amy Frankel, a court-appointed counselor who was selected out of a list of four. He attempted to contact Mother in June 1998, in order for her to schedule an appointment with Frankel, but she failed to respond as of August 1998. Father notified his attorney and chose another court-appointed counselor, Judy Tindall, from another list of four. After informing Mother in August 1998 that he scheduled an appointment with Tindall, she did not schedule an appointment until September 30, 1998. Father also sent two letters to Mother requesting information in regard to the children's activities as well as Christopher's college attendance, to which he received no response.

By December 1998, according to Father's testimony, the children and he attended three visits with Tindall before Mother "discontinued everything" upon being asked to "come into the process."

Although Father made multiple attempts to initiate subsequent counseling, it was not until June 1999, that the children and Father participated in their first session with counselor Linda Sharp Taylor, who also testified at the hearing.

Taylor testified that the counseling process, initiated by Father, began on May 27, 1999. The three children and Father, as a group, first met with her on June 10, 1999, and established that the goal for therapy would not be directed toward the past but to focus on their current relationship. During the third session, Christopher became upset and left the meeting early. Taylor believed that he was attempting to control the conversation and that his presence created a level of hostility and anger in the room. Therefore, Taylor decided not to include him in further sessions until he was able to manage his anger. Father, Morgan and Cody resumed therapy on July 29, 1999, and at that point, Taylor felt that the three were doing "quite well." She testified that the children and Father would continue to talk up to an hour after the sessions had ended on at least three occasions. She also testified that they made arrangements to meet each other outside of therapy, which included jet skiing with Cody on at least one occasion, after which Cody indicated that he had a great time, and breakfast with Morgan on one occasion, after which she said that she enjoyed driving her father's car.

Taylor further stated the children were present at only one session in August 1999, because Morgan informed her that they would be on vacation. However, Taylor called Mother's home in order to verify whether the children were on vacation, and they answered, although, Taylor reported that she "did not speak to [Mother] about this." She also testified that the sole session on August 19, 1999, was somewhat tense but that they were still making prog-

ress. The final two sessions were held on September 9 and 16 of 1999, in which they were making progress in terms of "getting their relationship back together."

After the September 16 session, Taylor testified that the children stopped attending and that she made three attempts, by leaving voice mail messages for Mother, to determine whether the children would be attending the scheduled sessions. She testified that Mother never called back. Taylor sent a letter at the end of September requesting Mother to attend a session and received no response. She sent another letter to inform the family that she would be out of the office throughout November and a final letter at the end of December requesting Mother to attend a session to which she received no response.

When Taylor was asked whether there has been parental alienation regarding the children and Mother, she responded, "My opinion would be that [Mother] has a great deal of influence on this process. And without her participation and support, she is interfering with this process going further and forward. And to that degree, that can be interpreted as alienation." When asked whether there were any other possibilities, in terms of helping Father form a relationship with the children if Mother did not cooperate, Taylor replied that she did not think there were any.

The trial court adopted the commissioner's findings and recommendations which provide in pertinent part:

\* \* \*

10. If a Court finds that a parent has, without good cause, failed to provide visitation or physical custody pursuant to the terms of a judgment of dissolution or any modifications thereof, it may abate, in whole or in part, any future obligations of support and may even transfer custody of the child. Section 452.340.7.

11. Morgan and Cody McCallister have lived with Mother since the date of the parties' separation in January 1993. The children want to remain in Mother's custody.

12. At trial, Mother testified that, given the ages of the children, "you'd have to ask the children if they want to go" visit Father. Although not directly prohibiting visits between Father and the children, Mother clearly does nothing to encourage an ongoing and continuing relationship between Father and the children.

13. Morgan McCallister testified that she doesn't want to see Father. She testified that "it would be better if people didn't tell me what to do." Presumably this applies to the Court as well.

14. Cody McCallister testified that "if I want to have a relationship with my father, I should be the one to choose. I should be the one to decide when."

15. Linda Sharp–Taylor, the licensed psychologist who provided counseling to Father and the children from May through September of 1999, testified that she felt the counseling was improving Father's relationship with Morgan and Cody. She detected no ongoing fear of Father by the children. The counseling abruptly stopped when Dr. Sharp–Taylor pressed Mother to get involved in the counseling process.

16. Based upon the ability of the Court to observe the demeanor of the various witnesses, the Court finds the testimony of Mother and the chil-

dren, as to their fears and concerns about Father, to lack credibility.

17. It is in the children's best interests that they have an ongoing and continuing relationship with Father. Since the dissolution of the parties' marriage, Mother, without good cause, has consistently refused to promote an ongoing and continuing relationship between Father and the children. Instead, she has encouraged the children in their self-centered and immature belief that they, and they alone, should determine whether they have a relationship with Father. Mother has successfully poisoned the children against Father. It is clear to the Court that Mother and the children will no more comply with any schedule of compensatory visits, than they have with earlier court orders. Thus, it appears that a transfer of custody is the only appropriate remedy in this case. Then and only then, will the children get the consistent counseling they need to restore their relationship with Father.

Further, the trial court entered the following Judgment of Modification and Civil Contempt:

1. Father's motion for emancipation is granted. Christopher McCallister is hereby declared emancipated as of September 2, 1998.
2. Pursuant to Section 452.340.7, RSMo, Father is hereby awarded the primary care, custody and control of the parties' children, Morgan McCallister and Cody McCallister.
2. (sic) [Mother's and Father's custody and visitation schedule].
3. Mother shall pay, effective April 1, 2000, child support in the amount of $365.00 per month. . . .

4. Based upon the transfer of custody, Father's motions for contempt and abatement of child support and Mother's motion to increase child support are hereby denied as moot.
5. Mother's cross-motion for contempt is denied.
6. Mother shall pay to Father $3000.00 as and for attorney's fees. Court costs are taxed to Mother.
7. All other provisions of the original Judgment and Decree of Dissolution, as modified, shall remain in full force and effect.

An examination of the parties' pleadings does not reflect a specific prayer for transfer of custody of Morgan and Cody. However, the trial court, as noted in paragraphs 1, 2, 4 and 5 of the judgment, granted Count II of Father's motion emancipating Christopher and, after awarding primary care, custody and control of Morgan and Cody to Father, denied Father's motions for contempt, Count I, and abatement of child support, Count III, as moot. Further, it denied Mother's motion to increase child support as moot and denied her motion for contempt.

A review of the trial court's findings does not indicate any specific factual findings supporting Mother's failure, without good cause, to provide visitation, physical or legal custody of Morgan and Cody to Father. The trial court relied on Section 452.340.7 RSMo 2000 (all further references herein shall be to RSMo 2000 unless otherwise indicated) and not on the parties' pleadings and entered a judgment based on that particular statutory provision.

Section 452.340 provides in pertinent part:

\* \* \*

7. The general assembly finds and declares that it is the public policy of

this state that frequent, continuing and meaningful contact with both parents after the parents have separated or dissolved their marriage is in the best interest of the child except for cases where the court specifically finds that such contact is not in the best interest of the child. In order to effectuate this public policy, a court with jurisdiction shall enforce visitation, custody and child support orders in the same manner. A court with jurisdiction may abate, in whole or in part, any past or future obligation of support and may transfer the physical and legal or physical or legal custody of one or more children if it finds that a parent has, without good cause, failed to provide visitation or physical and legal or physical or legal custody to the other parent pursuant to the terms of a judgment of dissolution, legal separation or modifications thereof....

Section 452.340 was extensively amended in 1997, 1998 and 1999, and clearly evidences a legislative intent to insure frequent, continuing and meaningful contact with both parents following a dissolution of their marriage. However, the trial court disposed of the issues raised in the parties' pleadings and, relying on Section 452.340.7, transferred custody of Morgan and Cody to Father without specifically designating such custody as legal or physical. The original decree did not specifically identify physical or legal custody but awarded the care, custody and control of the children to Mother, which includes legal and physical. The 1998 consent judgment, however, required each party to keep the other informed as to any medical problems or expenses associated with the children and to attend counseling. The present judgment does not specify legal or physical custody but awarded primary care, custody and control to Father. Therefore, it is necessary to consider whether the trial court's findings and conclusions are supported by substantial evidence as reflected in Mother's first point. Additionally, Mother argues that the best interests of the children are not served by the transfer.

■ The evidence primarily indicates that Father had ongoing problems exercising his visitation rights with the children due to the trouble they caused every time they visited him, and therefore, he suspended his visitation rights for approximately two years until they received counseling. Further, Father stated that he attempted to keep in contact with the children by telephone, but every time they spoke, the children were on a speakerphone in which "usually [he] could hear [Mother] coaching them in the background as [he] spoke to them." Although, he "couldn't really hear what she was saying." In addition, he testified that Mother refused to supply information about the children to Father and made major decisions affecting them without consulting or advising him.

During cross-examination, when asked whether Mother ever told him that he could not see the children, Father replied, "Of course not, she's slyer than that." He was subsequently asked, "Whenever you've shown up for visitation, have they always been sent out to go with you?" He responded that the only occasion, that he could recall, where the children "didn't come out to go with [him]," was on the previous Thanksgiving because the children were already at his house, due to a miscommunication between Father and the children.

Finally, Taylor testified that Mother had a great deal of influence on the therapy process, and without her participation and

support, she was interfering with the process going forward. Taylor also stated that she did not think that there were any other possibilities of Father forming a relationship with the children without Mother's cooperation.

The trial court found in pertinent part, in finding No. 17, that "it is in the children's best interests that they have an ongoing and continuing relationship with Father ....that Mother and the children will no more comply with any schedule of compensatory visits, than they have with earlier court orders," therefore, a transfer of custody is the only remedy to insure that they will get the consistent counseling needed to restore this relationship with Father.

As noted, this finding is directed to the counseling sessions and not to Mother's failure, without good cause, to provide visitation and physical or legal custody. To transfer custody based on failure of Mother and children to attend counseling is not authorized by Section 452.340.7. Further, Section 452.410, which authorizes a modification of a decree as to custody, requires a change in the circumstances of the child or his custodian and that modification is necessary to serve the children's best interests. None of Father's pleadings were directed to Section 452.410.

Although, arguably, the evidence may support a finding that Mother failed to comply with the consent judgment as noted in Father's motions, there is not substantial evidence to support a finding that Mother, without good cause, failed to provide visitation, physical or legal custody of Morgan and Cody to Father. Therefore, we must reverse the judgment as to the transfer of custody.

In Mother's second point on appeal, she contends that the trial court abused its discretion in ordering her to pay the attorney fees incurred by Father. As a result of our disposition of point one, we reverse and remand the award of attorney fees.

We affirm the trial court's judgment as to the emancipation of Christopher but reverse and remand the judgment regarding the transfer of custody of Morgan and Cody and the award of attorney fees for further proceedings in accordance with this opinion.

Judgment affirmed in part and reversed and remanded in part with directions.

LAWRENCE E. MOONEY, P.J. and SHERRI B. SULLIVAN, J., concur.