145 S.W.3d 902 (2004)
In the Interest of N.L.B.
L.B., Natural Mother, Appellant,
v.
The Jasper County Juvenile Office, Respondent, and
T.E.T. and L.S.T., Respondents.
No. 25533.
Missouri Court of Appeals, Southern District, Division Two.
October 15, 2004.
*904 William J. Fleischaker, Fleischaker, Williams & Powell, Joplin, for appellant.
Jerry L. Holcomb, Collins, Webster & Rouse, P.C., Joseph Hensley, Jasper County Juvenile Office, Joplin, for respondent.
ROBERT S. BARNEY, Judge.
By their three count petition for adoption, Respondents, T.E.T. and L.S.T. ("Foster Parents"), seek to adopt N.L.B., a child born on December 18, 1998.[1] Appellant L.B. ("Mother") is the biological mother of N.L.B. Following a hearing by the Juvenile Court of Jasper County, Missouri ("juvenile court"), the juvenile court transferred custody of N.L.B. to Foster Parents for the purpose of adoption, and terminated the parental rights of Mother, the putative father, and the "unknown" father pursuant to Chapters 453 and 211.[2] The juvenile court found three statutory grounds for terminating Mother's rights, and also found that the termination of Mother's rights served the best interests of the child. Mother now raises two points of juvenile court error. Mother's first point, discussed below, is dispositive of this appeal; accordingly, her second point will not be reviewed. We affirm the juvenile court's judgment.
While "[a]n appeal in an adoption case lies only from the decree of adoption", In re D.R.E., 696 S.W.2d 882, 883 (Mo.App.1985), a judgment terminating parental rights under Chapter 211, which is brought in conjunction with adoption proceedings, is an appealable judgment. See In re D.S.G., 947 S.W.2d 516, 517 (Mo.App.1997); In re G.M.T., 965 S.W.2d 200, 201-02 (Mo.App.1998); see also §§ 211.447.5; 211.447.8; 453.040(8); 211.261.1; and 211.477.6, RSMo Cum.Supp.2003.[3]
Preliminarily, we observe the record shows that prior to N.L.B.'s birth, Dr. *905 John Kelly ("Dr.Kelly"), who had been interacting with Mother in the birthing center of the hospital, expressed concern that Mother was not capable of managing a newborn and suspected that Mother was mentally ill. As a result of his concern, Dr. Kelly called a social worker and recommended that Mother undergo a psychological evaluation. Vicky Cupp ("Cupp"), a maternal social worker employed by the hospital, was brought in to evaluate Mother. Mother indicated to Cupp that she was living in a homeless shelter, but that she was going to hitchhike or take a bus to Kansas City once N.L.B. was released from the hospital. Cupp grew concerned that Mother, who had no prenatal care, wanted to leave the hospital with N.L.B. even though the child was born more than four weeks premature and had various medical problems. Cupp offered to bring in a psychologist to speak with Mother but Mother was resistant and "said that she was afraid that she could be put in a mental institution to keep her hushed up about some conspiracies against law enforcement and other agencies that she had information on." After discovering that Mother "could not see her own mother without supervision" and observing Mother's "[p]aranoid and delusional" behavior, Cupp placed a hotline call to DFS for a newborn crisis assessment.
Once N.L.B. was born, Diana White ("White"), a DFS caseworker, responded to Cupp's call on December 19, 1998. White stated that Mother exhibited an "[e]xtreme distrust" of her and expressed "paranoid-type thoughts." White had major concerns about Mother's homelessness, the conflicting stories she told hospital staff, and the fact that she had no plans for N.L.B.'s follow-up medical care. Accordingly, White filed a request for intervention with DFS.
On December 22, 1998, N.L.B. was placed in the temporary legal custody of DFS, pursuant to an order of the juvenile court. As previously related, N.L.B. was placed with Foster Parents on that date and he has remained in their custody since that time.
On May 19, 2000, Foster Parents filed their "Petition for Adoption", which included a request for transfer of custody and termination of parental rights.[4] A hearing on the matter was held on December 19, 2002.
Thereafter, the juvenile court terminated Mother's parental rights based on several statutory grounds. First, as delineated in section 211.447.4(2), the juvenile court found that N.L.B. had been neglected by Mother. Specifically, in relation to the mental condition of Mother, the trial court found pursuant to 211.447.4(2)(a) that "[M]other has been diagnosed by psychologist Judy [Kellenberger] as having a *906 persecutory type delusional disorder and by Dr. John Wade, a psychiatrist, as having a psycho-typal personality disorder." Additionally, the juvenile court found Mother had "resisted treatment" for her mental condition and there was "no reasonable likelihood her mental condition can be reversed. . . ." Further, the juvenile court found that "[M]other has failed to provide the child with adequate food, clothing, shelter and education although physically and financially able to do so by her minimal payment of support for the child while in alternative care." See § 211.447.4(2)(d).
Second, the juvenile court found that N.L.B. had been in the jurisdiction of the juvenile court for more than one year and that the conditions which resulted in the court's initial assumption of jurisdiction continued to exist. See § 211.447.4(3). Third, the juvenile court found that N.L.B. had been in alternative care for approximately forty-eight months, a period well in excess of the 15 out of 22 months pre-requisite to bringing a termination of parental rights action. See § 211.447.2(1).
On appellate review, the judgment in a termination of parental rights case will be sustained "unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law." In re F.M., 979 S.W.2d 944, 946 (Mo.App.1998). Substantial evidence means evidence which is "clear, cogent and convincing" or which "instantly tilts the scales in the affirmative when weighed against opposing evidence," leaving the fact-finder with "an abiding conviction that the evidence is true." In re A.M.C., 983 S.W.2d 635, 637 (Mo.App.1999).
In our review, we bear in mind that the juvenile court was in a superior position to judge the credibility of the witnesses and that it was free to believe all, part, or none of the witnesses' testimony. In re M.M., 973 S.W.2d 165, 168 (Mo.App.1998). Further, when the juvenile court has received conflicting or contradictory evidence, we view the facts in the light most favorable to the juvenile court's judgment. Id.
In order to terminate parental rights, there must first be clear and convincing evidence indicating that one or more grounds exist for termination under section 211.447. In re J.L.M., 64 S.W.3d 923, 924 (Mo.App.2002). If sufficient grounds exist, the court must then determine whether termination of parental rights is in the best interests of the child. In re C.N.W., 26 S.W.3d 386, 393 (Mo.App.2000); §§ 211.447.5 and 211.447.6. Consequently, until there has been an affirmative finding that grounds exist for termination and that such termination is in the best interests of the child, parental rights may not be terminated. In re J.L.M., 64 S.W.3d at 924.
Where multiple statutory grounds for termination of parental rights are found, in order to affirm the judgment, the appellate court need only find that one of the statutory bases was proven and that the termination was in the best interest of the child. See In re M.J., 66 S.W.3d 745, 747 (Mo.App.2001); In re J.L.M., 64 S.W.3d at 925.
Mother raises two points on appeal. As previously stated, Point I is dispositive, therefore Point II will not be reviewed.
In her first point, Mother maintains the juvenile court erred in terminating her parental rights under sections 211.447.4(2) and 211.447.4(3). However, Mother centers her assertions on her belief that there was insubstantial evidence supporting the juvenile court's finding that her mental condition "rendered her unable *907 to knowingly provide the child the necessary care, custody and control. . . ."
We begin our review by noting that, as previously set out, in order for this Court to affirm the judgment of the juvenile court we need only find that one of the statutory bases was pleaded and proven, and that termination of Mother's parental rights was in the best interest of the child. See In re M.J., 66 S.W.3d at 747. Accordingly, we will take up Mother's assertions that there was insufficient evidence supporting the juvenile court's determination under section 211.447.4(3). In doing so, we are also compelled to consider the provisions of section 211.447.4(3)(c), relating to the medical condition of Mother and her ability to knowingly provide for N.L.B.'s "necessary care, custody and control."
Here, the juvenile court found, pursuant to section 211.447.4(3)(a)-(d), that N.L.B. had been in the jurisdiction of the juvenile court for more than one year and that the conditions which resulted in the court's initial assumption of jurisdiction continued to exist. See § 211.447.4(3)(a)-(d).
In support of that finding, the juvenile court noted that it initially received jurisdiction because "[M]other suffers from a serious mental condition, shown by competent evidence to be either permanent, or because [Mother] is reluctant to seek, obtain and comply with treatment, such that there is no reasonable likelihood that the condition can be reversed." Further, the juvenile court found that Mother has failed to demonstrate at any time that she "has the ability to consistently meet the day-to-day physical, emotional, educational and medical needs of this child." Here, clear, cogent, and convincing evidence supports the juvenile court's findings.
Our review of the facts supporting the findings under section 211.447.4(3)(a-b), reveals that the record clearly shows Mother failed to comply with her treatment plan and did not take advantage of the services offered by DFS. At trial, DFS caseworker Marsha McGuire, who drafted Mother's treatment plan in 1999, testified that Mother did not cooperate with the terms of the plan; failed to complete the "Family Centered Out of Home Services" program; did not attend parenting classes; failed to allow home inspections; did not comply with her psychological evaluation for an extended period of time; did not inform DFS about her personal life or employment status; and, was generally uncooperative with DFS.
N.L.B.'s next DFS caseworker, Pat Mohling, echoed McGuire's evaluation of Mother's lack of compliance with her treatment plan. According to Mohling, Mother was very uncooperative; had a "negative attitude" in dealing with DFS; did not comply with her treatment plan; showed disinterest in the child; and, was often agitated and angry. Significantly, Mother admitted that she did not comply with her treatment plan.
We acknowledge that Mother did bring gifts to N.L.B. on occasion; was able to obtain adequate housing; ultimately completed her psychological evaluation; and, maintained employment throughout the course of these proceedings. However, this "`court must look to the totality of a parent's conduct . . .'", In re A.S., 38 S.W.3d 478, 485 (Mo.App.2001) (quoting In re N.M.J., 24 S.W.3d 771, 780 (Mo.App.2000), which, in turn quoted In re J.W., 11 S.W.3d 699, 706 (Mo.App.1999)), and considering the context of these positive actions by Mother and the fact that N.L.B. has been in DFS custody for over four years, the juvenile court "could easily have minimized or rejected this testimony." See In re R.R.T., 744 S.W.2d 829, 833 (Mo.App.1988).
*908 Although the court must "consider the terms of [the treatment plan], it also requires an affirmative duty on the part of the parent to support, communicate and visit the child and to show that the parent is committed to the child by showing an interest." In re J.M., 815 S.W.2d 97, 103 (Mo.App.1991)(interpreting 1986 statutory version of present § 211.447.4(3)(a)). In making its findings, it is well within the juvenile court's province to "`consider the length of time a child is out of a parent's custody and the limited contact during that time.'" In re S.L.N., 8 S.W.3d 916, 924 (Mo.App.2000) (quoting In re B.A., 931 S.W.2d 926, 930 (Mo.App.1996)). Mother made no attempt or request to have her visitation with N.L.B. reinstated after it was halted in December of 2000, when DFS and others concluded reunification efforts were futile. Additionally, other than two token child support payments of $20 and $50 respectively, made in October of 2001, and October of 2002, Mother made no attempt to provide support for N.L.B. Although there was no child support order entered by the juvenile court, Mother's "obligation to provide support to [her] child is not dependent upon the state informing [her] of that obligation," therefore, Mother had no excuse for failing to provide support for N.L.B. In re A.R., 52 S.W.3d 625, 640 (Mo.App.2001). Additionally, Mother failed to make any attempt to seek medical or psychological help since these proceedings commenced, although advised to do so by both Dr. Kellenberger and Dr. Wade, mental health professionals. The foregoing evidence sustains the juvenile court's determination that, in essence, Mother was ill-equipped to parent N.L.B., and was unwilling or unable to make adjustments necessary to take on the role of parent. See In re R.R.T., 744 S.W.2d at 833.
"`The apparent purpose of Paragraphs (a) and (b) [of section 211.447.4(3)] is to ensure that all reasonable means to help the parents remedy the adverse conditions are utilized, and that courts will not terminate parental rights where such efforts have not been made.'" In re A.R., 52 S.W.3d at 641 (quoting In re R.L.K., 957 S.W.2d 778, 782 (Mo.App.1997)). The juvenile court's finding that Mother failed to comply with her treatment plan and that additional services by DFS would not aid Mother is supported by clear and convincing evidence.
We turn now to the trial court's finding under section 211.447.4(3)(c) that Mother suffers from a mental condition that would not likely be reversed and which renders her unable to provide N.L.B. with the necessary care and control. We observe that Mother admits with great candor that "the evidence in this case supports a finding that [M]other had a mental illness." Her allegation of trial court error in her point relied on centers on the fact that "the only evidence that Mother's condition affected her ability to parent was a psychologist's opinion that she would have grave concerns for a child placed with Mother and that opinion was mere speculation and was not based on any opportunity to observe the Mother interrelate with the child."
"[S]tatutes allowing termination on account of mental illness are not intended to `punish' parents for conditions or behavior which they cannot avoid; rather, these statutes seek to protect the child from unavoidable adverse consequences resulting from the parent's condition." In re C.P.B., 641 S.W.2d 456, 460 (Mo.App.1982). "`Unlike neglect, abandonment, abuse, or nonsupport, the mental illness of a parent is not per se harmful to a child.'" In re D.L.M., 31 S.W.3d 64, 69 (Mo.App.2000) (quoting In re C.P.B., 641 S.W.2d at 460). "Therefore, when applying the `failure to rectify' test in cases involving a *909 mentally ill parent, the initial fact is not simply the persistence of the illness in the parent, but rather the fact of continuing actual or potential harm to the child." In re C.P.B., 641 S.W.2d at 460. The focus of such a determination should be on the ability of the mother to care for the child and her ability to maintain a parental relationship with the child that would not be harmful. In re D.L.M., 31 S.W.3d at 70.
We note first that the juvenile court's finding of mental illness was only one of its numerous reasons for terminating Mother's parental rights. With that being said, in our review of the record we find that there is clear and convincing evidence supporting the juvenile court's finding that N.L.B. is likely to be harmed in the future if his relationship with Mother were to continue.
At trial, there was evidence of Mother's "bizarre," "abstract," and "rambling" answers to questions; her generally paranoid and defensive behavior; and, her resistance to seek treatment or even acknowledge the extent of her mental illness. Further, there was evidence that Mother lacked experience with children; lacked maternal instincts; had no social support system to aid her in parenting; appeared awkward with N.L.B.; and, "present[ed] a very unsafe condition" for N.L.B. There was also testimony regarding Mother's "visions" and "near death experiences," as well as the fact that she often hears the voice of God speaking directly to her and has espoused a belief that N.L.B.'s father was an alien from another planet. At trial, Mother was variously characterized as delusional, agitated, angry, uncooperative, immature, stubborn, unfriendly, impulsive, belligerent, and anti-social. Further, there was evidence that Mother was not allowed to see her own mother due to a court order alleging elder abuse. Additionally, Mother threatened to kill her husband and he obtained an order of protection against heras did she against him.
We note that Judith Garrity Kellenberger ("Dr.Kellenberger"), a licensed psychologist, testified that she performed Mother's psychological evaluation, including testing and a clinical interview, on February 4, 2000. On the Parenting Assessment Skills Survey ("PASS") test, Dr. Kellenberger posed situational questions to Mother that required her to come up with a solution to typical parenting scenarios. Dr. Kellenberger stated that in forming her solutions, Mother "had a weakness in not acknowledging the feelings of the child"; did not question "why the behaviors were occurring" in the child; "rarely had a backup solution" to the problem; and, had "some bizarre answers" to several of the dilemmas posed by Dr. Kellenberger. In response to Dr. Kellenberger's question about how Mother would deal with an eleven-year-old child that had taken money from her purse, Mother suggested "shock therapy at the jail." Additionally, when asked how she would deal with a three-year-old child repeatedly taking a toy away from a sibling, Mother replied that she would pick the child up and politely explain the situation. Then Mother launched into a recitation of an event from her childhood in which she was babysitting some "problem children" and she locked them in a bathroom. Dr. Kellenberger stated that, in addition to Mother's inappropriate responses, she observed an "indication of immaturity," "stubbornness," an "unfriendly demeanor," "a rejection of traditional feminine values," "impulsiveness," "belligerence," and an "indication of hypo manic characteristics."
Based on the foregoing observations, Dr. Kellenberger diagnosed Mother as having a delusional persecutory type disorder. Dr. Kellenberger noted that this particular disorder is often difficult to treat because *910 the person is "naturally paranoid and suspicious" and "usually does not ask for help." She said that "the central theme of the delusions involve the person's belief that they are being conspired against," "they are always paranoid," and they are "often anti-social." Dr. Kellenberger stated that there was "very little likelihood" that Mother's condition would improve in the future. Even with medication and therapy, Dr. Kellenberger believed that it would be unsafe to let Mother have unsupervised visitation with N.L.B. Dr. Kellenberger stated that though she did not have enough of Mother's medical history to make a proper diagnosis, Mother could possibly be paranoid schizophrenic. While Dr. Kellenberger did not specifically make a finding that Mother was harmful to herself or others, she stated that it "can be implied under this diagnosis" and that people with Mother's disorder can "be physically harmful to someone else because usually the delusions involve someone else harming them."
Dr. Kellenberger also performed a clinical interview on Mother. In the interview Mother related "that she had been charged with abuse to her mother"; "that her sister was afraid of her and thought that she would kill her"; and, that "she had a briefcase stolen by a U.S. Senator when it was coming back through the mail...." Mother told Dr. Kellenberger that she heard voices one time when "[she] had been sick, lying in [her] trailer, [she] saw a big light and [she] heard the voice of God and [she] learned many things. [Mother] had been called back to help with the elderly."
As for Mother's ability to parent N.L.B., Dr. Kellenberger said that Mother's answers on the PASS test coupled with her lack of experience with children made her gravely concerned for the child's well-being if placed with Mother. Dr. Kellenberger expressed further concern with the fact that Mother has no supportive family members and has shut Father out of the child's life. When asked if she considered Mother to be "a threat to the health or the safety of her child," Dr. Kellenberger replied that Mother "had not had that opportunity" but Dr. Kellenberger believed that Mother "presents a very unsafe condition for a child" and recommended that Mother was "unsafe to be around the child" because the child would be at risk. Dr. Kellenberger's conclusion was that in her opinion Mother could not "safely parent this child" and it was in the child's best interest to have Mother's rights terminated.
Although Dr. John Wade ("Dr.Wade"), a psychiatrist, did not testify at the termination hearing, his testimony from the September 6, 2000, hearing was entered into evidence. Dr. Wade evaluated Mother at her request after she received Dr. Kellenberger's report and disagreed with those findings. Dr. Wade testified that he had interviewed Mother for about an hour and a half and disagreed with Dr. Kellenberger's diagnosis. Dr. Wade stated that he did not see a lack of empathy in Mother and found her to be "generally appropriate." In his own interview with Mother, Dr. Wade noted that she often became defensive and suspicious; was initially resistant; gave "abstract" and rambling answers; and, was "somewhat idiosyncratic." Additionally, Dr. Wade stated that he felt Mother was "oriented" during their discussion; that her answers were a little more elaborate than most, but were nonetheless appropriate; that she was not homicidal, suicidal, or hallucinating; that he observed no "overt delusions"; and, that he did not agree with Dr. Kellenberger's diagnosis of a delusional disorder. Dr. Wade stated that he would lean toward diagnosing Mother as having a mild schizotypal disorder and not a delusional disorder.
*911 Dr. Wade testified, however, that while schizotypal disorders are similar to delusional disorders, they are harder to treat because of the severity of the long term medications involved in treatment. Further, parents with this disorder are most likely going "to limit the exposure of that child to the outside world" based on their paranoid and distrustful thoughts. Dr. Wade stated that with both delusional disorders and schizotypal disorders there is a potential that the disorders "could actually impair their functioning in all major areas of life," including their ability to parent. Dr. Wade concluded that Mother was not incapable of parenting, but would have some challenges.
The purpose and concern of section 211.447.4(3)(c) is the same as all sections contained in the juvenile code, which is the best interest of the child. In re D.L.M., 31 S.W.3d at 70. Based on the foregoing, the juvenile court had ample evidence upon which to find that not only might Mother be harmful to N.L.B. in the future, but that she would be unable to care for him properly due to the ongoing and irreversible nature of her mental illness. The juvenile court was well within its authority in reviewing the evidence of the medical professionals and choosing among conflicting evidence, if any. See In re M.M., 973 S.W.2d at 168. The juvenile court's determination was not speculative, as suggested by Mother, and was supported by competent evidence.
Having determined that sufficient grounds existed for the termination of Mother's parental rights, we must still consider whether termination was in N.L.B.'s best interest under section 211.447.6. "Unlike a finding that a proper ground exists for termination, a finding that termination is in the best interests of the child does not require proof by clear, cogent and convincing evidence." In re A.S., 38 S.W.3d at 486. "The standard of review for determining that termination of parental rights is in the best interests of the child is abuse of discretion." In re C.W., 64 S.W.3d 321, 326 (Mo.App.2001). Thus, if the record supports the juvenile court's finding that termination of parental rights was in the best interests of the child, the judgment will be affirmed. See In re S.J.G., 871 S.W.2d 638, 640 (Mo.App. 1994).
In reaching the conclusion that termination of Mother's parental rights was in N.L.B.'s best interest, the juvenile court enumerated and considered those factors set out in section 211.447.6, to-wit: N.L.B.'s lack of emotional ties to Mother and N.L.B.'s "positive emotional and physical" ties to Foster Parents; Mother's lack of regular contact and visitation with N.L.B.; the extent to which Mother had not provided payments for the care and maintenance of N.L.B., including the time the child was in DFS custody; that additional services would not bring about lasting parental adjustment enabling N.L.B. to return to Mother within an ascertainable time; and, the disinterest in and lack of commitment to N.L.B. by Mother. See § 211.447.6(1)-(7).[5]
Here, as noted above, the record is replete with evidence that termination of Mother's parental rights was in N.L.B.'s best interests. At the time of trial, Mother had not had visitation with N.L.B. since December of 2000. She made no effort to *912 have her visitation reinstated and failed to take any steps to work with DFS in this matter. N.L.B. has lived with Foster Parents for all but four days of his life. L.S.T. testified that her family loves N.L.B. and that he believes them to be his parents. Linda Lee ("Lee"), a licensed professional counselor, found in her "pre-adoptive bonding assessment" on Foster Parents and N.L.B., that "the bonding between [N.L.B.] and [Foster Parents] was extremely healthy" and that N.L.B. considered Foster Parents to be his parents.
Mother, as previously set out, failed to support N.L.B. except for two payments of child support in the five years that the child has been in alternative care. Mother has shown a lack of interest in N.L.B. and has failed to make a commitment to maintaining her relationship with the child as illustrated by her lack of treatment for her mental illness. No plans or services were available to effectuate a return within a reasonable time to Mother. Accordingly, we are convinced that the above evidence serves as "[c]lear, cogent, and convincing evidence" that a ground existed to terminate Mother's parental rights under section 211.447.4(3), and that such termination by the juvenile court was in the best interest of N.L.B. See In re N.M.J., 24 S.W.3d at 780. Point denied.
The judgment of the juvenile court is affirmed.
PARRISH, P.J., and BATES, C.J., concur.
NOTES
[1] Count I of the petition sought transfer of custody and termination of the parental rights of N.L.B.'s parents pursuant to Chapter 453; Count II sought termination of parental rights under Chapter 211; and, Count III sought adoption of N.L.B. With the exception of the first four days after his birth, Foster Parents have had physical custody of N.L.B. all of his life. Section 453.070.7, RSMo Cum.Supp.2003, provides in pertinent part that:

Any adult person ... who, as foster parent or parents, have cared for a foster child continuously for a period of nine months or more and bonding has occurred as evidenced by the positive emotional and physical interaction between the foster parent and child, may apply to such authorized agency for the placement of such child with them for the purpose of adoption if the child is eligible for adoption. The agency and court shall give preference and first consideration for adoptive placements to foster parents. However, the final determination of the propriety of the adoption of such foster child shall be within the sole discretion of the court.
Statutory references are to RSMo 2000, unless otherwise indicated.
[2] No appeal has been lodged either by the putative or "unknown" father.
[3] Section 453.040 sets out in pertinent part that:

The consent to the adoption of a child is not required of:
A parent whose rights to the child may be terminated for any of the grounds set forth in section 211.447, RSMo, and whose rights have been terminated after hearing and proof of such grounds as required by section 211.442 to 211.487, RSMo. Such petition for termination may be filed as a count in an adoption petition.
§ 453.040(8).
Section 211.447.5 sets out, in pertinent part:
The juvenile court may terminate the rights of a parent to a child upon a petition filed ... in adoption cases, by a prospective parent, if the court finds that the termination is in the best interest of the child and when it appears by clear, cogent and convincing evidence that grounds exist for termination pursuant to subsection 2, 3, or 4 of this section.
Section 211.447.8 provides that:
In actions for adoption pursuant to chapter 453, RSMo, the court may hear and determine the issues raised in a petition for adoption containing a prayer for termination of parental rights filed with the same effect as a petition permitted pursuant to subsection 2, 3, or 4 of this section.
Section 211.261.1 provides in pertinent part:
An appeal shall be allowed to a parent from any final judgment, order or decree made under the provisions of this chapter which adversely affects him....
Section 211.477.6, RSMo Cum.Supp.2003 provides:
The granting or denial of a petition for termination of parental rights shall be deemed a final judgment for purposes of appeal.
[4] We note the juvenile court entered a finding of jurisdiction over N.L.B. on December 5, 2000. Mother appealed that finding and this Court remanded the judgment on the basis that it was "defective in that it d[id] not fully comply with the requirements of § 211.183...." In re N.B., 64 S.W.3d 907, 914 (Mo.App.2002). The judgment was otherwise affirmed.
[5] "The statute leaves it to the [juvenile] court's discretion to make findings on the factors it deems applicable to this case." In re M.H., 859 S.W.2d 888, 897 (Mo.App.1993)(interpreting § 211.447.3, RSMo 1986, the predecessor version of § 211.447.6, RSMo 2000). Accordingly, the juvenile court in this matter made no findings under § 211.447.6(6) and (7), finding them to be inapplicable.