In the Interest of L.R.S.,

C.M.S., Appellant,

v.

The Greene County Juvenile Office, Respondent.

No. 27871.

Missouri Court of Appeals, Southern District, Division One.

Jan. 17, 2007.

Petition for Rehearing and Transfer Denied Jan. 25, 2007.

Application for Transfer Denied Feb. 27, 2007.

James R. Sharp, Sharp & Bredesen, Springfield, for appellant.

Bill Prince, Springfield, for respondent.

DANIEL E. SCOTT, Judge.

Appellant ("Mother") appeals the termination of her parental rights [1] to her two-year-old daughter, L.R.S. ("Child"), raising two points of error. Mother's second point is dispositive. We affirm.

Ten months before Child was born, Mother's other child ("Sibling") was placed

---

**1.** The parental rights of the alleged biological father and any unknown biological father were terminated in the same case, but there is no appeal as to those determinations.

in foster care after repeated sexual abuse by Mother's paramour. There was substantial evidence Mother knew or should have known of the abuse—including Mother's own statements that she knew the two were sleeping together—but failed to protect Sibling therefrom. Shortly thereafter, Mother became pregnant with Child, who was born in April 2004 with heart problems and other special needs. In June 2004, an abuse and neglect petition was filed regarding Child. After a hearing, the juvenile court found that Mother was unable to provide Child with the necessary care, custody, and control and Mother's failure to protect Sibling from sexual abuse resulting in Sibling being placed in foster care, created a substantial risk of abuse and/or neglect for Child. Thus, the court placed Child in foster care also, and due to her special needs, into a medical foster home.

The original treatment plan for both children sought reunification with Mother. But largely due to Mother's lack of progress, the juvenile office filed a petition to terminate parental rights in November 2005, more than one year after Child was taken into care. With respect to Mother, the petition alleged two statutory grounds for termination: Section 211.447.4(2)[2] abuse/neglect and Section 211.447.4(3) failure-to-rectify. In June 2006, after a trial in which both sides offered evidence, the court entered findings of fact, conclusions of law, and a judgment and order terminating parental rights. The court found both alleged statutory grounds for termination had been established, and termination of Mother's parental rights was in Child's best interest.

■ For a court to terminate parental rights, it must find (1) at least one statutory ground for termination by clear, convincing and substantial evidence, and (2) that termination of parental rights is in the child's best interest. *In re N.L.B.*, 145 S.W.3d 902, 906 (Mo.App.2004). Mother's two appeal points challenge, respectively, the juvenile court's abuse/neglect and failure-to-rectify findings. To affirm, however, we need only find that one such basis was proven and that termination was in the child's best interest. *Id.* at 906. We consider first Mother's Point II, which challenges the failure-to-rectify determination.

■ The juvenile court found Mother had failed to rectify conditions regarding her continuing neglect, ongoing mental condition and failure to seek treatment therefor, ongoing lack of insight about protecting her children, and ongoing inability to appropriately parent Child; that these conditions were of a potentially harmful nature; and there was little or no likelihood they would be remedied at an early date so Child could be returned to Mother in the near future. As required by statute, the court made further findings regarding Mother's mental condition, her progress under the treatment plan, and the success or failure of agency efforts.

The court noted Mother was subject to treatment plans relating to both Child and Sibling which required Mother to cooperate with the Children's Division, but Mother denied being subject to any such plan, and said she intended to file a motion to relieve her of same. As to progress under the treatment plans, Mother had refused to permit caseworker home visits; failed to consistently provide requested information, or to verify attendance at or completion of parenting classes; and refused to voluntarily submit to psychological evaluation or to follow through with psychological/psychiatric care.

**2.** Statutory references are to Missouri Revised Statutes (2000).

The court found that Mother was provided intensive and extensive services in both Child's and Sibling's cases, but she either refused to participate or failed to demonstrate an assimilation of information provided in those programs/services she did participate in.

The court further found that Mother suffers from a mental condition which is either permanent or not reasonably likely to be reversed and which renders her unable to knowingly provide Child the necessary care, custody, and control. Despite uncontradicted professional testimony that "much treatment" was necessary for Mother to improve her mental difficulties (which included affective instability, impulsive sexual relationships, and maladaptive and difficult interpersonal relationships), she failed to follow through with intensive therapy or other recommendations. In fact, Mother denied having any mental illness or that she needed mental health services; refused to submit to psychological evaluations;[3] and refused or failed to attend counseling or therapy to address any of her diagnosed mental health disorders. Mother's ongoing untreated mental illness directly impacted her parenting ability, her ability to protect Child from the type of abuse to which Sibling was subjected, and her ability to provide for Child's special medical needs.

The court found that Mother failed to provide financial support, nor (except for one stuffed animal) anything else for Child's care, although there was no evidence Mother was incapable of providing at least minimal support.

The court further found that, subsequent to Child's removal, Mother had failed to demonstrate the ability to emotionally care for Child's special needs; that Mother's continuing/untreated mental condition, her ongoing lack of insight as to how her actions put her children at risk of sexual abuse, and her failure to participate in services designed to provide her such insight so Child might safely be returned to her care, combined to pose a significant likelihood of future harm to Child; and that Mother's failure to participate in services and her neglect evidenced a disinterest in and a lack of commitment to Child, and resulted in a negative impact on Child.

Point II claims the juvenile court's failure-to-rectify finding is unsupported by substantial evidence and against the weight of the evidence in four respects, to-wit:

a. The evidence at trial indicated that Mother's mental condition was treatable to allow her, with the help of her family, to take care of the child and that she was receiving mental health treatment at the time of trial;

b. There was little attempt on the part of the Division of Children's Services to provide mental health services to Mother in a form that she could take advantage of, given her mental illness and her poor financial circumstances;

c. Mother did substantially comply with the treatment plan in this case and in another case involving another child, in that she obtained a psychological evaluation and consistently visited the child, including making numerous trips to see the child when she was in a hospital in St. Louis; and

d. There was no evidence of Mother's ability to support the minor child while she was [in] foster care in that Mother had only one brief job delivering telephone books and could not

---

**3.** Except one ordered by the juvenile court to check Mother's competency to represent herself when she wanted to fire her lawyer and proceed *pro se.*

contribute to paying rent much less to contribute to the support of the minor child in this case.

Our review is guided by established principles:

> The trial court's decision to terminate parental rights will be sustained on appeal unless there is no substantial evidence to support the judgment, it is against the weight of the evidence, or it erroneously declares or applies the law. In our review, we are mindful that the juvenile court was in a superior position to judge the credibility of the witnesses and that it was free to believe all, part, or none of the witnesses' testimony. Furthermore, the standard of proof may be satisfied even though the trial court has contrary evidence before it or evidence in the record might support a different conclusion. "In our review, we consider all facts and reasonable inferences therefrom in a light most favorable to the judgment below, and we will reverse 'only when we firmly believe that the judgment is wrong.' "

*In re A.K.F.*, 164 S.W.3d 149, 151–52 (Mo. App.2005) (internal citations omitted). Viewed through this lens, the trial testimony of various caseworkers and mental health professionals before the juvenile court may be summarized in part as follows:

### Kate Lowrey

Kate Lowrey was a Children's Division caseworker for Mother and Sibling in 2003–04. Lowrey has a psychology degree.

Lowrey questioned Mother's parenting ability. Lowrey consistently offered Mother mental health treatment, and repeatedly reviewed the treatment plan with Mother and encouraged her to seek psychiatric care, but Mother never did so. Mother denied anything was wrong with her. Mother refused to sign release of information forms for past medical or mental health information. Mother also missed scheduled parenting classes, and never provided verification of completing those classes. Mother was ordered to pay $355 per month child support; was employed at different places; and had the ability to contribute support in some amount.

Another concern about Mother's parenting ability was her mental difficulties. Mother's judgment was seriously compromised during Lowrey's time on the case. Sometimes Mother's perception of reality was seriously distorted. She said people were following her or threatening her. Mother was unable to make decisions in a prudent manner; had failed to supervise her child; and had failed to protect her child. Mother's mental condition was a danger to Sibling's emotional welfare, in Lowrey's opinion, and the same would have been true for an infant if one were in her care.

Mother's conversations were sometimes disjointed, nonsensical, and incoherent. Lowrey was seriously concerned by Mother's loose associations and tendency to get on a topic and endlessly repeat herself. Mother made no significant progress in improving any of the issues that brought her child into juvenile care. Mother failed to totally complete any issue of her treatment plan, except updating her addresses.

### Mindy Ellis

Mindy Ellis, a licensed clinical social worker, provided services to Sibling in 2003–05. During counseling, Sibling said Mother had shown her Internet pornography, specifically, a picture of a man with a large penis.

Ellis conducted four sessions of family therapy with Mother and Sibling. Moth-

er's behavior was consistently unstable and inappropriate. Mother never demonstrated any insight into either Sibling's needs or Mother's own issues. Ellis was "absolutely" concerned about Mother's thought processes. Mother twice claimed street people had a hit out on her, somehow connected with semi-trucks forcing her off the road, and that increased gas prices were a signal for truckers to harm her. She also claimed she was losing wages of $8,000 per week because of visits to DFS and therapy. Ellis also was "absolutely" concerned about Mother's ability to parent appropriately. In one therapy session, Sibling was actually parenting Mother, by encouraging Mother to follow the treatment plan, but Mother replied to Sibling "I'm still in my s-e-x phase." At least three times, Mother complained it was "just not worth it" to get her daughter back. Ellis was convinced that returning home would present a danger to Sibling, and had similar concerns about Mother's ability to parent a newborn. A newborn needs constant supervision and care. Mother was disorganized, sometimes disoriented, and exhibited psychotic symptoms and delusions which would make it very difficult for her to care for a newborn's needs. Moreover, Mother showed no willingness to screen the type of men she would bring into the home, even after her paramour "copiously" sexually abused her older daughter. Without treatment and medication, such psychological issues preclude a close and loving relationship between mother and child.

### Linda Kempf

Linda Kempf, a licensed professional counselor, started working with Mother in June 2003, as a result of Sibling's sexual abuse at the hands of Mother's paramour. When Kempf tried to talk to Mother about a safety plan to protect her daughter in the future, Mother laughed and said "if it means giving up sex, I am not going to do that." At that time, Mother was pregnant with Child, and said there were three possible fathers. Mother later told Kempf that 22 men wanted to marry her and claim they were the father. Mother also claimed divine involvement in her pregnancy.

Mother demonstrated delusional thinking. She claimed she could read people's thoughts, and predict storms, tornados, and the like. She said the Mafia had followed her and run her off the road. She claimed she invented solar panels in high school, but her science teacher stole her invention. Kempf disbelieved these stories, but did believe Mother when she said she was a sex addict, because Mother gave lots of details about her sexual activity.

Against Kempf's advice, Mother stopped counseling in October 2003. Mother still had serious issues. Kempf questioned Mother's ability to parent children. She lacked parental skills, she had antisocial traits, and her judgments were erratic. Kempf did not think Mother's primary concern was her daughter's safety. Kempf would have questioned Mother's ability to parent a newborn, particularly one with special medical needs. Kempf would be concerned if Mother would properly care for the baby. She had problems caring for pets, let alone a child. Kempf questioned if Mother would stay home or run off for sexual adventures with some Internet contact. Her general behavior was irresponsible.

Mother exhibited borderline personality disorder, with psychotic features. She had delusions and was in and out of reality. She claimed she could read minds and that that she had special psychotic gifts. She also exhibited adult antisocial traits. She was extremely promiscuous, continually

talking about all of her male conquests. Her thought processes were very criminal, like "it's OK if I can get away with it" thinking. Mother would not cooperate with caseworkers nor follow recommendations of therapists; she blamed others for problems a lot; and she was difficult.

When Mother quit counseling in October 2003, she was not a good parent to Sibling (Child was not yet born). Kempf believed future contact between Mother and Sibling would be emotionally harmful to Sibling.

## Dr. Mark Bradford

Dr. Mark Bradford, a clinical psychologist experienced in social services cases, performed a psychological assessment of Mother in September 2003. Among other things, Mother exhibited unusual magical thinking, such as whether she had been marked by "the angel of death" when she was in "the eighth stage." She claimed psychic abilities, including the ability to hear what other people were thinking, and that she predicted the Pierce City tornado. She said she had a 109.8 fever for most of one full school year as a child. She claimed at one time she couldn't feel hot or cold; she could remove hot items from an oven with her bare hands without feeling anything. She claimed she was working 172–180 hours weekly. To Dr. Bradford, Mother's propensity toward magical thinking, claims of psychic ability, and possible delusion and distortion was significant. She had a severe problem if she truly believed the things she said, and it was also a problem if she was intentionally lying, since that would indicate a desperate need to be special and to combat feelings of inferiority or failure. Therapy and medication are really the only way to address such mental health issues.

Mother admitted Internet pornography activities, and claimed she had a sexual addiction. She alleged an extensive sexual history from age seven, including a two-year period when she claimed to have sex with 200 men, and said she notched her bedpost to keep track of them. Dr. Bradford agreed there is such a thing as sexual addiction, a very distorted and maladaptive way of seeking love and nurturance through sexual activity, and he rather believed Mother in this particular regard. She convinced Dr. Bradford that she had a sexual problem and was extremely promiscuous and sexually impulsive, at least at some time in her life, and Dr. Bradford feared Mother might return to those behaviors if she was stressed and if sexually-inclined men were available to her. Dr. Bradford worried about Mother's ability to safely parent children; that she again would choose men potentially dangerous to her children. Mother admitted prior bad choices in men, which raised concern she would do so again.

Mother reported so many different things that she was subject to multiple psychiatric diagnoses. Her psychological evaluation indicated she was not always in touch with reality. She was prone to distortion, exaggeration, and making false allegations against DFS, lawyers, or anybody; sexual disorder; many lovers; promiscuous behavior; adult antisocial behavior. Mother's Axis I and II diagnoses required treatment, but part of Mother's problem is her tendency to fault everyone else, and fail to look at her own issues. Dr. Bradford predicted this would occur over and over again. She will criticize minor faults of others, while ignoring her own major problems and failings. Mother needs therapy for these problems. If she instead lingers in a psychotic kind of state, always blaming others and never accepting responsibility, then she will not become the person she needs to be for her children. Mother's diagnoses were unlikely to improve on their own, without interven-

tion. She needed individual therapy with someone experienced with multi-personality disorder, psychotic disorders, and personality disorders, plus medication management of her symptoms. If Mother started taking personal responsibility for her problems, and truly started coming to places of repentance and change, one could begin to think she was overcoming her problems. But the prognosis is poor as long as she keeps blaming others, finding fault, and exaggerating. To improve the prognosis from poor to something else, she would need to get into therapy, individual therapy, anger management therapy, medication, etc. She would need to start cooperating with caseworkers, instead of almost delusional distortion of what they are trying to do. These are what Dr. Bradford would like to see. If Mother is continuing to do those negative things today, as she was back at the time of his 2003 evaluation, Dr. Bradford says Mother has not really changed. She still has some of the same problems, if not worse, and that would be a concern for her ability to safely parent a child.

### Elizabeth Cox

Beth Cox was the alternative care caseworker on Sibling's case when Child was born. Her treatment plan regarding the baby tracked Mother's existing treatment plan for Sibling, and initially was a reunification plan. When Cox explained the treatment plan and what Mother needed to do, Mother indicated she understood. Mother also knew if things did not go well after a year, the agency might look at terminating parental rights. This is always discussed when a child is first taken into custody, and Mother indicated she understood.

Still, Mother's cooperation was inconsistent. Mother did not follow her treatment plan, nor do things Cox continually asked

her to do. Mother became hostile toward Cox, and acted rather paranoid when Cox visited her for a home study. There was nowhere in the home for a baby to stay, nor had Mother done any planning except to say she would need to find another place. Mother became confrontational when Cox tried to learn about her income or property. Mother refused to answer questions or cooperate with Cox in filling out paperwork. Mother was under a child support order, but was not paying any support, nor providing in-kind support (toys, clothing, diapers, etc.) for either daughter.

Mother tended to blame others. She absolutely failed to demonstrate any insight about her parenting obligations. She refused to sign medical information release forms. Cox had major concerns about Mother's mental state and ability to care for children, especially her special needs baby with serious physical problems that required heightened attention and vigilance. Cox's concerns were based on her own observations and prior caseworker files. Mother had made no progress, by the time of Child's birth, toward positioning herself to parent either of her children. That is why the baby's treatment plan matched Sibling's case, because Mother had made no progress to that point.

Cox worked with Mother when Child was in the hospital for her heart surgery. Mother claimed the baby, only a month or two old, would say "Hi" when Mother walked in, and you could hear it very clearly. Mother couldn't assimilate what the doctors told her about the baby's necessary care, and made outlandish statements about various ailments that Mother claimed the child had. Then Cox would call the doctors about Mother's statements, only to learn there was no way Child could have had the ailments Mother was claiming. So Mother apparently did not really

or rationally understand Child's medical situation, and Cox "absolutely" felt Child would be in imminent danger of risk of harm if Mother could not follow the doctors' recommendations.

Cox was very concerned about Mother's mental health. She urged Mother to see a counselor, get evaluated, and address her mental issues, but Mother would not sign or do anything. Mother instead went off on tangents about conspiracy theories, solar panels, over-the-road truck drivers, and the Mafia or someone wanting her dead. Mother became very accusatory that Cox wanted to take her baby, so Cox could sell Child and make lots of money. Mother claimed prior caseworkers had tried to sell Sibling, but Mother knew all about it. Cox wanted another psychological evaluation to update Dr. Bradford's findings. Cox made specific referrals for Mother to do so, but Mother never did. Mother either would not show or simply refused to go. There was never any verification that Mother had dealt with any of her mental problems noted in Dr. Bradford's 2003 psychological evaluation.

### Oneta Hicks

Oneta Hicks, LPN, was Child's daytime home nurse. Child is in a medical foster home, which means the foster parent has special training to do things when Hicks isn't there. The current foster mother is an EMT. Child and Hicks also work with a physical therapist, a speech therapist, and an occupational therapist, each of whom comes to the foster home twice weekly.

Child still cannot chew or swallow food. Every 60–90 minutes, she gets two ounces of PediaSure pushed via syringe very slowly through the feeding tube, so she doesn't get sick and throw up. Child has had three heart surgeries so far. A machine is used to check her heart rate and oxygen saturation.

### Lisa Rendall

Lisa Rendall, the current caseworker, took over from Beth Cox in 2004 and had been on the case two years at the time of trial. Mother did not keep in touch with Rendall weekly per the treatment plan. Mother refused to let Rendall do a home visit, claiming the prior caseworker, Beth Cox, stole her food, which was attempted murder because Mother was diabetic.

Mother never attempted to support the children financially, either with money or providing in-kind items like diapers or other necessities. Mother did not keep the agency apprised of her employment situation or her ability to maintain employment. Mother provided no verification that she is incapable of working, and to Rendall's knowledge, Mother is not on any type of disability.

Mother never completed her treatment plan requirements to attend and work hard in parenting classes, to follow all class recommendations, and to submit proof of completing parenting classes. Mother told Rendall she couldn't complete the classes because "we would not turn over her children." Rendall talked with Mother about completing parenting classes, with no apparent success.

Mother demonstrated little insight or understanding of Child's medical needs. Mother's nonsensical statements about Child's sun allergy and rolling away from sunlight in the hospital, or that tubes were put in Child's ears because of her heart condition, added to Rendall's concern whether Mother can care for Child. Mother's failure to appreciate or understand Child's medical needs was itself a concern for returning Child to Mother's home, even with a day nurse or family assistance.

Mother consistently refused to attend counseling although Rendall made many such referrals. Mother always made excuses for her non-attendance, but basically said she did not need counseling or therapy. Rendall asked Mother to submit to additional psychological evaluations at least three different times in November 2004, December 2004, and May 2005. Rendall made appointments for Mother on those occasions, and gave Mother the doctors' names and telephone numbers. Mother refused to go to any of them. Specifically, Rendall tried to refer Mother to the Springfield Regional Center, a facility operated by the Department of Mental Health. Rendall gave Mother the names and phone numbers for that appointment, and Rendall herself actually talked to a Mr. Lucas to set up the appointment. On several occasions, Rendell also unsuccessfully tried to refer Mother to the Burrell Center, which gets state funding to provide comprehensive psychiatric services to area citizens. The agency likes to get general psychological evaluations in these situations every year. This would have helped the agency tailor therapy or mental health services to Mother, but Mother's repeated refusals thwarted such help. Mother's failure or refusal to address her mental health issues raises many safety concerns about Mother's parenting abilities. Mother apparently doesn't want to deal with these or admit she has a problem, and this itself is a concern. Rendall has seen no substantial change in Mother's mental condition. She is pretty much the same now as she was in 2004.

When Rendall took over this case, she familiarized herself with the prior file and the work done by her predecessors. She knew why Sibling came into foster care, and she knew what services the agency offered Mother before Rendall came into the case. Mother has not made any kind of progress since way back when Sibling first came into foster care, before Child's birth. Mother has not totally complied with any aspect of her treatment plan except with regard to visitation. In fact, Mother denies she is under a treatment plan anymore, and says she will file a motion to terminate the plan or rescind her signatures. There are no further services the agency could offer that would enable Mother to parent Child in the foreseeable future. Rendall has offered services already, which Mother has refused. Even if additional services were available, Rendall doubts Mother would follow through with those either.

The trial record, only partially summarized above, amply supports the juvenile court's Section 211.447.4(3) failure-to-rectify finding and rebuts Mother's Point II challenges thereto. The juvenile court was in a superior position to judge the credibility of the witnesses; was free to believe all, part, or none of the testimony; and could find the standard of proof met despite contrary evidence that might support another conclusion. *In re A.K.F.*, 164 S.W.3d at 151. There was overwhelming and perhaps even uncontroverted evidence that Mother seriously needed and still needs therapy and other services; that agencies, caseworkers, and mental health professionals repeatedly sought to help Mother in these regards; but that Mother rebuffed virtually all such efforts. For over two years leading up to trial, Mother violated or failed to comply with her treatment plans in almost every respect. The record does not establish Mother's inability to provide even token support, but her failure to do so is uncontradicted. Mother's nonsupport of her children, failure to comply with her treatment plans, refusal to cooperate with the Children's Division, and failure to seek mental help despite the urging of all interested mental health professionals and caseworkers, sustains the

juvenile court's determination that, in essence, Mother was ill-equipped to care for this special needs child, and was unwilling or unable to make adjustments necessary to take on the role of parent. *See In re N.L.B.*, 145 S.W.3d at 908.

We acknowledge that Mother visited Child regularly. But courts " 'must look to the totality of a parent's conduct,' " and considering that Child has been in foster care over two years, the juvenile court " 'could easily have minimized or rejected this testimony.' " *In re N.L.B.*, 145 S.W.3d at 907, *quoting In re A.S.*, 38 S.W.3d 478, 485 (Mo.App.2001) and *In re R.R.T.*, 744 S.W.2d 829, 833 (Mo.App. 1988).

Mother claims "[t]he evidence at trial indicated that Mother's mental condition was treatable to allow her, with the help of her family, to take care of the child and that she was receiving mental health treatment at the time of trial." We note initially that the juvenile court's finding of mental illness was only one of its numerous reasons for terminating Mother's parental rights. That said, the record provides clear and convincing evidence for the court's finding that Mother's continuing/untreated mental condition, ongoing lack of insight, and failure to participate in services combined to pose a significant likelihood of future harm to Child. *See In re N.L.B.*, 145 S.W.3d at 909. Next, as previously shown, the record convincingly establishes that Mother consistently *refused* mental health treatment from case inception through trial. This not only contradicts her claim about "receiving mental health treatment," but also undercuts her argument that her "mental condition was treatable." Dr. Bradford testified therapy and medication were the only way Mother could address her mental health issues; absent such intervention, she was unlikely to improve on her own. Other witnesses echoed similar opinions, apparently disputed by no one. The trial record confirmed that Mother did *not* follow through with medication and therapy, and she did *not* improve. Finally, the record reflects a number of concerns regarding Mother's family as potential caregivers for Child.

Since Mother's attack on the failure-to-rectify ground for termination fails, we need not consider the abuse/neglect issues. The juvenile court's findings that termination is in Child's best interest are unchallenged. The judgment is affirmed.

PARRISH, J., and RAHMEYER, P.J., concur.

## ON MOTIONS FOR REHEARING AND/OR TRANSFER TO THE SUPREME COURT

PER CURIAM.

Mother moves us to rehear or transfer this case in light of *In re C.W.*, 211 S.W.3d 93 (Mo. banc 2007), wherein the juvenile court terminated a mother's parental rights based almost exclusively on a 29–month–old mental health evaluation. *Id.* at 99. The mother received mental health treatment and medication after her evaluation, and the juvenile court specifically found she complied with her mental health counseling requirements between the evaluation and trial. *Id.* Since the mother so fully complied, and her mental health was the underlying basis for termination, the juvenile court should have gotten an updated mental evaluation. *Id.*

This case is different. Here, the juvenile court's mental illness finding was just one of numerous reasons for its decision. Here, Mother steadfastly refused mental health treatment that everyone wanted her to get. Here, Mother repeatedly refused to let the Division update her mental evaluations or keep appointments the Division made to do so. Mother's intransigence did

not preclude the juvenile court from reaching its considered judgment, particularly when the record established that Mother needed therapy and medication to improve, she refused to follow through with those, and she failed to improve. Mother's motions are denied.