144 S.W.3d 856 (2004)
In the Interest of Q.D.D., a child under seventeen years of age.
State of Missouri, Greene County Juvenile Office, Petitioner-Respondent,
v.
J.I.D., Respondent-Appellant.
No. 25920.
Missouri Court of Appeals, Southern District, Division One.
August 31, 2004.
Application for Transfer Denied September 16, 2004.
Application for Transfer Denied October 26, 2004.
*857 John E. Kelly, Springfield, for appellant.
Bill Prince, Springfield, for respondent.
PHILLIP R. GARRISON, Presiding Judge.
Appellant, J.I.D. ("Mother"), the biological mother of Q.D.D., appeals the termination of her parental rights pursuant to a petition filed by the Greene County, Missouri, Juvenile Office ("Respondent").[1] Mother contends on this appeal that the juvenile court's judgment was against the weight of the evidence. We affirm the judgment.
In reviewing a termination of parental rights case, the record should be viewed in the light most favorable to the judgment. In Interest of B.L.B., 834 S.W.2d 795, 799 (Mo.App. E.D.1992). In this case, Mother has had a long relationship with the Division of Family Services ("DFS"), now known as the Division of Children's Services of the Department of Social Services ("the Division"). In 1995, Mother was the subject of an abuse and neglect hotline report when she left Q.D.D., then six months old, alone in an apartment. Q.D.D. was temporarily removed from her custody and a family centered service case was opened. DFS required that Mother attend a substance abuse treatment program, CSTAR, and take medication for a panic disorder. Mother failed to attend CSTAR and took the medication only "for a while" compelling the Division to close the family centered service case, citing Mother's failure to cooperate.
Between 1995 and 2001, Mother and Q.D.D. lived in a household characterized by domestic violence. In 1997, Mother was involved in a domestic violence hotline incident in which her husband threw a boot through a window, raining shattered glass down on Q.D.D's infant sibling. Mother testified that Husband was abusive to her for periods of time before the glass-breaking incident and that he used to hit her a lot in the presence of the children.[2] The police were called again in 1998 when *858 Husband threatened Mother's life in front of Q.D.D. and his sibling. According to Mother's testimony, Husband "put a knife to my throat and told the kids to `[g]o in the bedroom. I'm going to kill your mother.' And so [sibling] and [Q.D.D.] ran in the bedroom and he [Husband] ... called the police. He locked us up in the bedroom." Mother said that Husband told the police he was "going to blow her head off."
On December 11, 2001, the Springfield Police Department responded to a hotline report of abandonment. According to the police report, Mother put the children outside in the cold and stated in front of a witness that "I want to kill them and myself. I don't want them." After investigation, DFS coded the hotline report "AA," abandonment, and, because of Mother's threats against the children, issued a protective order and took custody. Mother was given one-hour supervised visitation bi-weekly with Q.D.D. and a younger sibling, and weekly visits with an infant sibling. In May 2002, the visits were changed to four-hour unsupervised visits. In September of 2002, visitation once again became supervised because Mother picked up the children late from school several times, failed to bring a car seat for Q.D.D.'s infant sibling, and failed to complete anger management classes. In addition, Q.D.D. reported that Mother would stay inside the house and nap while the children played outside unsupervised and that "Mom and Grandma would yell a lot" during the visits.
Bobbie Jo Maifeld ("Maifeld"), Mother's DFS case worker, testified that in February or March 2003 she discovered, through police reports, that during the time the children were in custody, Mother had been involved in domestic violence with three men. In fact, under cross-examination during trial, Mother admitted that there had been violent confrontations with five men, including her estranged husband, and also with a female friend of Mother. In May 2002, Mother got into an argument with a male friend, during which each broke out the tail lights of the other's car with hammers. During that same summer, Mother was raped by an acquaintance. In November 2002, Mother was charged with tampering when she broke her estranged husband's door and scratched the word "bitch" into the trunk of his girlfriend's car with a key. This incident occurred while Mother was in anger management class. Although Mother pled guilty to the tampering charge in July 2003, she denied her guilt at the trial of this case. In addition, according to police reports, Mother was assaulted by a boyfriend, Ronnie Crockett ("Crockett"), on December 26, 2002 and again on January 16, 2003. She also testified that during their three-month relationship Crockett abused her, threatened her and her family with violence and death, and that she knew that he had been in prison. Mother had a verbal altercation with a fourth man, which resulted in a police report in April 2003.
Mother also threatened her friend Courtney Eden ("Courtney") on October 2, 2002. According to the police report, Mother told Courtney, "I'm going to break your neck. I'll kill you. I know where you live and ... where you go to school and I know what you drive." The report indicated that the reason Mother threatened Courtney was because Mother thought Courtney was responsible for having the children taken away the previous December.
Mother never reported any of these incidents to DFS or to her counselor. Mother testified that she was afraid that if she told Maifeld about the incidents, they would not return her children. This, indeed, happened when Maifeld learned of the police *859 reports. Maifeld changed Mother's case goal from one of reunification to termination of parental rights in March 2003. In addition to the threats of violence, Maifeld was concerned about Mother's unstable employment history and had evidence that Mother was not actually living at the apartment she had rented.
Maifeld testified that as part of DFS's treatment plan, Mother was required to "cooperate and maintain contact with DFS, and that cooperation was to include keeping the social worker [informed of] changes in address, employment or household composition within [forty-eight] hours of the change." Mother was not consistently honest about her employment status. Maifeld testified that several times she called to verify employment information given her by Mother and discovered that Mother was no longer working there. Mother was employed most of the time the children were in custody, however she kept changing jobs, working in as many as twelve or thirteen places between March 2002 and the time of trial. Although employed, Mother failed to provide any financial support for Q.D.D. while he was in the custody of DFS.
DFS was also concerned about Mother's housing situation because it appeared that Mother was not actually living in the apartment she rented. Mother's landlord informed Maifeld that she did not believe that Mother was living in the apartment. Upon inspection, the landlord found no food in the refrigerator or clothing in the closets. When Maifeld tried several times to make unannounced visits, no one was home.
On April 10, 2003, sixteen months after Q.D.D. was taken into protective custody, Respondent filed a petition to terminate the parental rights of Mother and Q.D.D.'s supposed biological father. The petition was heard on September 10, 2003, and the juvenile court found, by clear, cogent and convincing evidence, that Mother's and unknown biological father's parental rights should be terminated. In deciding to terminate Mother's parental rights, the juvenile court considered statutory factors in compliance with Section 211.447.[3] First, the juvenile court found that Q.D.D. had been in custody for fifteen of the most recent twenty-two months.[4] Then the juvenile court found that Q.D.D. had been abused and/or neglected. Finally, the juvenile court found that Q.D.D. had been under the jurisdiction of the juvenile court in excess of one year and that conditions of a potentially harmful nature continue to exist in that Mother had failed to comply with the terms of treatment or the social service plan.
The trial court's decision in a termination of parental rights case will be upheld unless there is no substantial evidence to support it, the decision is against the weight of the evidence, or it erroneously states or applies the law. In re J.L.F., 99 S.W.3d 15, 17 (Mo.App. S.D.2003). Substantial evidence is evidence which is "clear, cogent and convincing" and "instantly tilts the scales in the affirmative," leaving the fact finder's mind with "an abiding conviction that the evidence is *860 true." In re A.M.C., 983 S.W.2d 635, 637 (Mo.App. S.D.1999). The appellate court must view the facts in a light most favorable to the juvenile court's judgment as that court has a superior opportunity to assess the credibility of witnesses and is free to believe all, part or none of their testimony. Matter of M.M., 973 S.W.2d 165, 168 (Mo.App. S.D.1998).
In order to terminate parental rights, the juvenile court must first find clear and convincing evidence of one or more grounds for termination under Section 211.447. In re J.L.M., 64 S.W.3d 923, 924, (Mo.App. S.D.2002). Once one or more grounds for termination are found, the court must determine if termination is in the best interest of the child. In re C.N.W., 26 S.W.3d 386, 393, (Mo.App. E.D.2000). It is only after both statutory grounds for termination and the best interests of the child have been determined that a parent's rights may be terminated. In re J.L.M., 64 S.W.3d at 924.
This court has determined that "[w]here multiple statutory bases for termination of parental rights are found, all that must be found in order to affirm the judgment is that one of the statutory grounds was proven and that termination is in the best interests of the child[ ]." M.J. v. Greene County Juvenile Office, 66 S.W.3d 745, 747 (Mo.App. S.D.2001).
One of the statutory grounds the juvenile court found to support termination of Mother's parental rights was that conditions of a potentially harmful nature continued to exist as described in Section 211.447.4(3).[5] This ground is often known as failure to rectify (e.g., In Interest of C.L.W., 115 S.W.3d 354, 362 (Mo.App. S.D.2003)). Mother contends on appeal that that finding was against the weight of the evidence. Mother also argues that she "... substantially complied with the terms of her treatment plan and cooperated with [D.F.S.] in adjusting her circumstances and in remedying the conditions which brought the child into care."
The juvenile court found that conditions of a potentially harmful nature continued to exist, including but not limited to:
the continuing instability of [Mother]; the continuing chaotic lifestyle of [Mother]; [Mother's] continued relationship with abusive males; [Mother's] continuing inability to provide safe and stable housing for the child; [Mother's] ongoing involvement with law enforcement related to incidents in assaultive behavior and property damage....
Mother also appeared to be living with a friend rather than at the apartment she had rented and continued to be involved with "law enforcement" and "abusive individuals."
Mother contends that, while there may have been problems in the past, she had been living a "more or less settled existence (without men) for six months before trial," that she has had stable housing for a *861 year, and that her last brush with law enforcement was in November 2002.[6] She contends that these facts are evidence that Mother's life is not the "continuing instability" and "continuing chaotic lifestyle" it may have once been.
Here there was a plethora of evidence supporting the conclusion that Mother's lifestyle is not indicative of a stable home for Q.D.D. and to doubt her veracity. Discussing Mother's truthfulness, the juvenile court states:
[Mother] was not consistently cooperative or honest with the Division and others involved in her case. [Mother] did not keep the Division informed as to her employment status and in fact misrepresented her employment circumstances to her caseworker. [Mother] has been deceptive in her housing circumstances, informing the Division she was residing in one location while spending significant periods of time at ... [a friend's house], the residence where many of [Mother's] police involvements emanated from. [Mother] did not keep the Division informed as to her involvement with law enforcement as well as her ongoing involvement with abusive individuals.
The juvenile court has a better opportunity than the appellate court to determine credibility. (See Matter of M.M., 973 S.W.2d at 168.)
Mother also maintains that she substantially complied with the terms of her treatment program. The record does indicate that Maifeld testified, albeit somewhat reluctantly, that Mother had completed her treatment program. While this achievement is laudatory, we must look at the totality of Mother's conduct, both before Q.D.D. was taken into protective custody and afterward. "All grounds for termination must to some extent look to past conduct because the past provides vital clues to present and future conduct." In Interest of T.T., 954 S.W.2d 429, 432 (Mo.App. W.D.1997). In addition, compliance with a service agreement does not prevent the scales of justice from "instantly tilting" in favor of the findings of the juvenile court. In Interest of K.D.H., 871 S.W.2d 651, 657 (Mo.App. W.D.1994). Indeed, the officer's burden of proof may be met even when the court has contradictory evidence before it. Id.
The juvenile court made extensive findings of fact, pursuant to Section 211.447.4(3)(a), on the extent to which Mother complied with her treatment plan. The court listed elements of the treatment plan that Mother had successfully completed, such as obtaining housing, completing a psychological evaluation and attending counseling. However, it also discussed Mother's deception regarding both housing and employment, her continuing involvement with abusive individuals and law enforcement, and her failure to provide financial support for Q.D.D. even though financially able.
The juvenile court had substantial evidence to conclude that termination of Mother's parental rights in Q.D.D. was appropriate pursuant to Section 211.447.4(3).
As we have sustained the juvenile court's determination on the ground of failure to rectify, we do not need to address Point I in which Mother claims that she did not neglect Q.D.D., but rather made "adequate provision for [Q.D.D.'s] return to a safe and appropriate environment." As discussed above, only one statutory ground, plus best interest of the child, *862 need be found to uphold a termination decision. M.J., 66 S.W.3d at 747. Because Mother did not challenge the court's determination that termination was in the best interest of the child, we shall not address it.
There was clear, cogent and convincing evidence to show that conditions of a potentially harmful nature continued to exist and that termination of parental rights would be in the best interest of the child. The judgment of the juvenile court is affirmed.
PREWITT and RAHMEYER, JJ., concur.
NOTES
[1] At the time of trial, Q.D.D. was a nine-year-old male
[2] Although Q.D.D. has two younger siblings who were mentioned in various police reports, the issue in this appeal is Mother's parental rights to Q.D.D.
[3] Statutory references are to RSMo 2000, unless otherwise indicated.
[4] A recent Missouri Supreme Court case, In the Interest of M.D.R., 124 S.W.3d 469, 476 (Mo. banc 2004), held that this is not a "factor" to be used to terminate parental rights but is merely a trigger for the mandatory filing by a juvenile officer of a petition for termination of parental rights. See also In the Interest of J.V.O., 133 S.W.3d 570, 575 (Mo.App. S.D.2004). As this provision was only one of the factors listed by the court below, this finding does not affect our analysis.
[5] Section 211.447.4 provides in part:

(3) The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:
(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms[.]
[6] The trial record, however, shows that it was April 2003, and not November 2002, when Mother was involved in her last altercation which resulted in a police report.