In the Interest of B.L.H., a minor.

Missouri Division of Social Services,
Division of Family Services,
Petitioner/Respondent,

v.

C.C.J. and B.L.H., III,
Respondents/Appellants.

Nos. ED 84857, ED 85193.

Missouri Court of Appeals,
Eastern District,
Division Two.

March 22, 2005.

John R. Bird, St. Louis, MO, for appellant C.C.J.

Steven W. Neimeyer, The Neimeyer Law Firm, P.C., Clayton, MO, for appellant B.L.H., III.

Barbara L. Greenberg, Robin Ruhe Murray, Family Court of St. Louis County, Clayton, MO, for respondent Juvenile Officer.

Richard J. Childress, St. Louis, MO, for respondent Missouri Children's Div.

Stanley I. Schechter, Clayton, MO, for Guardian Ad Litem.

KATHIANNE KNAUP CRANE, Judge.

Mother and father separately appeal from the trial court's judgment terminating their parental rights to their minor child pursuant to section 211.447 RSMo (2000). We have consolidated this appeal. In her two points on appeal, mother challenges the existence of clear, cogent and convincing evidence supporting the trial court's findings pursuant to sections 211.447.4(2) and 211.447.4(3). In his two points on appeal, father also challenges the existence of clear, cogent, and convincing evidence to support the findings made pursuant to sections 211.447.4(2) and 211.447.4(3). In addition, in their arguments both parents challenge the findings supporting the trial court's conclusion that termination was in the child's best interests. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother, C.C.J., is the natural mother of the child, B.L.H. (the child), born out of wedlock on July 17, 2001, when mother was 19 years old. Father, B.L.H., III, is the natural father of the child, and was 25 years old at the time of the child's birth. At the time of birth, mother had been using marijuana for over a year, and the child was born drug-exposed. On July 20, 2001, a hospital social worker alerted Division of Family Services (DFS)[1] to a positive drug screen for marijuana on mother and the child.

Mother and the child lived with mother's family. Father was also a caretaker for the child at that time. Between August 13

and August 16, 2001, the child suffered a fractured scapula. Mother testified that she did not know how the child was injured.

On August 21, 2001, when he was one month old, DFS took the child into protective custody. In his petition filed that day, the juvenile officer alleged that the child was without proper care and custody, in that between the dates of August 13 and August 16, 2001, while in the care and custody of his mother, the child sustained an acute transverse fracture through the left acromial spine, which "could not have resulted from accidental means and [was] the result of abuse and neglect." On September 7, 2001, the juvenile officer amended the petition to add the following allegation:

II. The juvenile is without proper care and custody in St. Louis County, in that said juvenile was born on or about July 17, 2001, and the juvenile and his mother each tested positive for the presence of marijuana in their urine in tests conducted on or about said date. The presence of marijuana in the juvenile's urine could not have resulted from accidental means and was the result of abuse or neglect.

On September 13, 2001, DFS entered into a service plan with mother. Mother's plan required her to:

1. Visit the child at least two times per month;

2. Make financial contributions toward the support of the child;

3. Obtain a drug/alcohol evaluation as approved by the DFS;

4. Obtain a psychological evaluation as approved by the DFS;

---

1. The Division of Family Services was divided into the Children's Division and Family Support Division in August, 2003. For consistency we will refer to this agency as DFS in this opinion, even though the Children's Division succeeded it in August, 2003.

5. Obtain drug/alcohol screenings to be completed within 24 hours;

6. Obtain and maintain housing;

7. Obtain day care;

8. Satisfactorily attend and participate in psychological/psychiatric counseling;

9. Satisfactorily attend and participate in parenting classes

10. Satisfactorily attend and participate in any program, class or other course of action recommended;

11. Inform DFS about changes in address, telephone, job, people living in home;

12. Cooperate and utilize the services offered or provided by DFS or the court;

13. Comply with all orders of the Family Court.

Father's service plan had similar provisions, except he was not required to participate in psychological counseling at that time or to obtain housing or day care. However, he was ordered to satisfactorily attend and participate in an anger management program. On October 15, 2001, the court conducted a dispositional hearing, found the allegations of the petition and amendment true, and continued jurisdiction over the child.

The trial court's dispositional order placed the child in the legal and physical custody of DFS for suitable placement but granted each parent supervised visitation with the child. The court further ordered each parent to submit to a psychological evaluation, a substance abuse evaluation, and random drug screens within twenty-four hours of a DFS request, all to be arranged and paid for by DFS unless other funding was available. Each parent was also required to complete a DFS-approved parenting class. Additionally, mother was ordered to undergo individual therapy, and father was also ordered to complete a DFS-approved anger management program. The court approved the written service plans.

On November 14, 2001, the St. Louis County Circuit Court issued an *ex parte* order of protection against father on mother's behalf.

On April 11, 2002, the Juvenile Officer filed a petition for termination of both mother's and father's rights, but dismissed the petition without prejudice on November 21, 2002, reserving the right to refile.

On November 21, 2002, the trial court held a permanency hearing. In its review order, it determined that the permanency plan for the child was either reunification with mother or adoption. The review order found that DFS had provided the parents counseling, psychological services, a parent aide, and substance abuse treatment, but that mother and father did not comply with the court-ordered services and that returning the child to his parents continues to be contrary to his welfare. The court continued supervised visitation with the child and ordered that each parent undergo individual therapy and submit to random drug screening. Additionally, each parent was ordered to pay $50.00 per month to DFS for child support.

On March 6, 2003, the court held another permanency review hearing. It found that the current permanency plan was either reunification with mother and/or father or adoption. It found that DFS had provided counseling, housing assistance, parent aide services, and substance abuse evaluation and testing, but that mother and father had not complied with the court order. It continued supervised visitation and required mother and father to continue individual therapy and submit to random drug screens.

In September, 2003, after another permanency review hearing, the court found

that the permanency plan was reunification with mother or father or adoption. The court found that DFS provided counseling for parents, parent aide services, and housing referrals. The court found that these efforts did not enable the return of the child to the home, because DFS had not provided evidence of drug screens showing negative results. The court continued to grant mother and father supervised visitations arranged by DFS. It ordered both parents to continue to participate in individual therapy and father to undergo paternity testing. It ordered DFS to present written verification that two drug screens were requested per month and to submit any available results at the next hearing. It also ordered DFS to file with the court all documentation requested by the deputy juvenile officer for review in connection with the filing of a termination of parental rights petition.

On February 6, 2004, the Juvenile Officer filed a second petition to terminate the parental rights of mother and father. It alleged that termination was warranted for the reasons that: 1) the child had been adjudicated abused or neglected, and that the abuse or neglect was adjudicated as true on October 15, 2001; 2) the child had been under the court's jurisdiction for over one year, and the conditions which led to assumption of jurisdiction still existed, or conditions of a potentially harmful nature continued to exist with little likelihood that they would be remedied at an early enough date for the minor to be returned to either mother or father in the near future, or the continuation of the parent-child relationship greatly diminished the child's prospects for early integration into a stable and permanent home; and 3) termination was in the child's best interests. The DFS Investigative Report and Social Study with attachments prepared by Denis

V. Sharopin, Social Service Worker, was attached to the petition.

The termination of parental rights hearing was held on April 26, 2004. At trial, Jill Calhoun, the child's case manager, testified on behalf of the Juvenile Officer. During her testimony, the court admitted Exhibits 1–9, 12–16, and 18. Each of these exhibits was admitted without objection except for Exhibit 3.

The agency consent signed on April 27, 2004 averred that DFS would accept the child for foster care, that he was adoptable, and that suitable adoptive parents were available.

Mother testified on her own behalf. Father testified on his own behalf, along with his father, and his sister.

*Evidence Regarding Mother*

Ms. Calhoun testified that the child was born drug-exposed, that mother admitted abusing marijuana, that mother completed a drug treatment program but not aftercare, and that she had tested positively for marijuana.

She testified that mother complied with her service agreement in the following respects: mother regularly visited the child when the parent aide brought the child to mother's home for weekly visits; she made financial contributions to the child's support; she obtained a drug and alcohol evaluation; she obtained a psychological evaluation; she attended a parenting class; and she completed a drug treatment program.

However, mother missed seventeen drug screens. Of the ten drug screens she did complete, eight were positive. Mother tested positively for marijuana both before and after completing the drug treatment program. Ms. Calhoun testified that she tried to counsel mother regarding her drug use and offered mother another referral to a drug treatment program, but she declined.

DFS had determined that mother's family's home, where mother lived after the child was born, was not a suitable placement and that she would have to obtain other housing. Mother did not obtain separate housing until January, 2004, a few months prior to the trial.

Further, mother was required to participate in psychological counseling, but her attendance at sessions with her first counselor was inconsistent, she never made appointments with her second counselor, and she was eventually dropped by her third counselor because she stopped coming. Her third counselor reported that in September, 2003, mother stated that she needed more therapy before the child could be permanently returned to her custody. That counselor opined that mother would benefit from more consistent therapy to address healthy parenting, the stress caused by her own family, and managing a relationship with father. However, after that date, mother did not return to therapy and mother reported to the counselor that therapy was not helpful to her.

Ms. Calhoun opined that she did not believe mother would be able to complete her written service plan if she were given additional time because after two and a half years, she was still using drugs and had not participated in drug aftercare. She testified that mother's failure to comply with the service agreement demonstrated that mother was currently not able to provide for the child's care custody and control. She testified that although mother loves the child, her continued drug use showed a lack of commitment to the child. She further opined that the child would be at risk for physical or mental harm if placed in his mother's custody because of her continued drug use. She also opined that there were no additional services DFS could provide that would bring about the child's reunification with mother.

Mother testified that she had smoked marijuana for four years and continued to do so on an almost daily basis, even though she knew it was in an obstacle to custody. She attributed her drug use to the stress of having a child, visitation, school, and the court case. She testified that she knew that her drug use was keeping her from having the child returned but, "that's like a chemical dependency for me. It just is." She admitted that two counselors had suggested that her marijuana use could be attributed to self-medication for depression. She offered that the only thing that could be done about her marijuana use would be to give her "some pretty strong depression, or some kind of anxiety medication." However, mother had seen a psychiatrist for her depression, who had prescribed Paxil, but she stopped taking it shortly after it was prescribed. She did not follow up on any other referrals that DFS gave her for depression because she thought she would not be able to pay for any medication.

She admitted that her drug use had not changed since the child's birth and that she had not completed the aftercare program. She admitted that she had last used marijuana the day before the hearing and used it "pretty much" every day. She had rejected drug treatments as recently as the month before. She further testified that she stopped therapy because she did not feel like it was helping.

*Evidence Regarding Father*

At the time of the child's birth, father was living at his parents' home, which DFS determined was not an appropriate placement. Ms. Calhoun testified to father's compliance with the service plan. Father regularly visited the child when the parent aide brought the child to his home for visits, made financial contributions to the child's support, and underwent a psychological evaluation.

However, father did not obtain a drug and alcohol evaluation and only completed two of 27 required drug screens. Of those two drug screens, one was positive for marijuana. Further, father did not participate in parenting classes, although he was given referrals to parenting classes through DFS and the Crisis Nursery.

Father participated in anger management and psychological therapy. However, he did not go to his first therapist, and his attendance at sessions with his second therapist was inconsistent. In March, 2002, father's counselor, Mr. Tobin, contacted his caseworker because father did not show up for counseling appointments. Again, in September, 2000, Mr. Tobin reported that father had not attended counseling for three months. Ms. Calhoun testified that as of January, 2004, father had not been to counseling in months. He only began therapy again in March, 2004, just prior to trial.

Since the child's birth, father has lived intermittently at his parents' home. He also stayed with a friend in Lake St. Louis for nine months, a co-worker for five months, his sister intermittently, and was homeless for a few months the year prior to trial. He had notified Ms. Calhoun the day before the hearing that he had moved into a trailer, which notice was too late for her to verify.

Ms. Calhoun opined that father had shown a lack of commitment to the child because after two and a half years, he had not obtained a drug evaluation, had not provided drug screens, did not complete a parenting class, and has had inconsistent housing. She believed that the child would be at risk for physical or mental harm if placed in father's custody because there was no verification that he was not using drugs or alcohol. She also opined that there were no additional services that the DFS could provide to father that would bring about reunification with the child.

Father called Ms. Calhoun a "liar" and a "bitch" while she was testifying. The trial judge admonished father repeatedly for his courtroom behavior, and the court had to move father and place restrictions on him during the trial because of his failure to control himself. Father interrupted mother's testimony to contradict her and shouted expletives during mother's testimony. Father stormed out of the courtroom during mother's testimony and did not return until it was time for him to testify.

Mother testified that she had no current relationship with father because of his temper. She described the ways he had physically abused her, and she testified that she had obtained several orders of protection against him. Mother also testified that father had used marijuana with her.

When asked how he interacted with the child, father replied only, "He's spoiled—He's spoiled rotten, put it that way." Father testified that all of the DFS records about his non-compliance were false, and he contradicted all of the testimony about his non-compliance. He claimed that he had a brain tumor and a heart murmur, and took "chemo pills," but would not sign releases for his medical conditions to be verified because he believed that the termination proceeding could not proceed as long as the juvenile officer did not have his complete medical information.

*GAL's Recommendation*

The GAL recommended termination. He saw no real progress made towards reunification since the dismissal of the first petition in November, 2002. He said the same problems continued. He pointed out that mother had admitted a chemical dependency and had smoked marijuana as recently as the day before trial. He observed that father had a history of multiple

jobs and multiple living arrangements and had claimed that all of DFS's records were false and also claimed to have a serious or possible terminal disease.

*Judgment*

On June 3, 2004, the trial court entered its findings, recommendations, and order terminating the parental rights of both mother and father. The trial court first found grounds for termination pursuant to section 211.447.4(2) for abuse and neglect. The trial court also found grounds for termination of mother and father pursuant to section 211.447.4(3) [2] for failure to rectify. The court also made the findings pursuant to section 211.447.6(1)-(7) on the seven factors the court must consider when terminating parental rights under section 211.447.4. The trial court concluded that termination of mother's and father's parental rights was in the best interests of the child pursuant to section 211.447.5.

*DISCUSSION*

■ A judgment terminating parental rights is authorized if it is the best interests of the child and if one of the statutory grounds for termination set out in subsections 2, 3 or 4 of section 211.447 is supported by clear, cogent and convincing evidence. Section 211.447.5 RSMo (2000); *In re E.L.B.*, 103 S.W.3d 774, 776 (Mo. banc 2003). The state's burden of showing clear, cogent and convincing evidence is met when the evidence "instantly tilts the scales in favor of termination when weighed against evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *In re K.A.W.*, 133 S.W.3d 1, 12 (Mo. banc 2004). The existence of even one statutory ground for termination is sufficient if termination is in the children's best interests. *E.L.B.*, 103 S.W.3d at 776; *In re C.N.W.*, 26 S.W.3d 386, 393 (Mo.App.2000).

■ We review a judgment terminating parental rights under *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); that is, we will affirm the judgment unless it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law. *In re E.T.C.*, 141 S.W.3d 39, 45 (Mo.App.2004).

I. *Section 211.447.4(3)*

Mother and father each contend that there was insufficient clear, cogent and convincing evidence to support the findings made pursuant to section 211.447(3) that conditions of a potentially harmful nature continue to exist because they did not comply with the services required by their service plans or that they failed to adjust their circumstances or conduct to enable the return of the child to their care.

■ For parental rights to be terminated under section 211.447.4(3), several requirements must be met: (1) the child must have been under the jurisdiction of the juvenile court for a period of one year; and (2) either (a) the conditions which originally led the court to assume jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, and that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or (b) the continuation of the parent-child relationship greatly diminishes the child's chances for early integration into a permanent and stable home. *In Interest of K.D.H.*, 871 S.W.2d 651, 656 (Mo.App.1994). The trial court found that each of these conditions existed. It is undisputed that the child had been under the jurisdiction of the juvenile court for a period of one year.

2. The court's order contains a typographical error in identifying this statute.

Mother and father challenge the evidence supporting the remaining findings.

■ A failure to rectify sufficient to support termination under section 211.447.4(3) must be "based on a determination that conditions of a potentially harmful nature continued to exist as of the termination, rather than a mere finding that conditions that led to the assumption of jurisdiction still persisted." *K.A.W.*, 133 S.W.3d at 10. Section 211.447.4(3) directs the court to consider and make findings on four factors specified in subparagraphs (a) through (d) in making this determination. Any one of the four factors under section 211.447.4(3) is a condition or act that may have a negative impact on a child, and if found to exist, should be considered in deciding whether grounds for termination under subsection (3) exist. *E.T.C.*, 141 S.W.3d at 48; *In Interest of J.A.A.*, 829 S.W.2d 79, 81 (Mo.App.1992). The factors do not constitute separate grounds for termination in and of themselves, but rather are categories of evidence to be considered with all other relevant evidence. *In re N.M.J.*, 24 S.W.3d 771, 778 (Mo.App.2000).

The court based its decision terminating both parents' parental rights on the basis of the following two factors:

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circum-

stances or conduct to provide a proper home for the child; . . . .

The conditions that originally led to the assumption of jurisdiction was that the child was without proper care and custody in that the child had suffered the fracture to his scapula and both mother and the child had tested positive for marijuana at birth. The question for our decision is whether conditions of sufficient severity and of a potentially harmful nature continue to exist. *K.A.W.*, 133 S.W.3d at 10–11.

*Mother—Findings and Evidence*

■ The court examined mother's compliance with and progress under her service plan and found that while she consistently visited the child when the child was brought to her, made financial contributions for the child's support, and participated in a drug and alcohol evaluation, she failed to engage in drug-rehabilitation aftercare, had consistently tested positive for marijuana after completing the program, and did not undertake further drug treatment offered by the DFS, claiming she did not need treatment. It found that she did complete a parenting class and undergo a psychological evaluation, but failed to follow through with individual counseling with any of the three counselors referred to her and did not obtain the ordered drug screens. It also determined she failed to timely obtain stable housing appropriate for herself and the child. The court also found that mother continuously failed to adjust her circumstances or conduct to provide a suitable home for the child, despite the diligent, reasonable, and continuing efforts of DFS.[3]

---

3. With respect to the other two factors, the trial court found no evidence that mother suffered from a mental condition that could not be reversed and rendered her unable to care for the child under (c). Under subsection (d), the court found that there was no evidence presented that demonstrated that mother "suffers from a chemical dependency which prevents her from consistently providing the necessary care, custody and control for the child except that the mother has consistently tested positive for marijuana in urine screens requested by the Children's Division. Further, although mother completed a drug

The record supports the trial court's findings with respect to mother. We first look at the conditions that led to the assumption of jurisdiction. At the time of the child's birth, both mother and the child tested positive for marijuana. Before the child was a month old, he suffered a non-accidental, serious injury, while in mother's and father's custody. Mother could not identify the perpetrator or explain how the injury happened. After the child was taken into custody, DFS determined that mother's family's home, where mother lived, was not a suitable placement for the child.

 We next look at whether conditions of a potentially harmful nature continue to exist. In this case, mother entered into a service plan designed to assist her in obtaining reunification. Accordingly, we consider the extent to which mother made progress in complying with the terms of her service plan and in adjusting her circumstances and conduct to provide a suitable home for the child. Mother commendably complied with several parts of her service plan. However, partial compliance with the service plan does not prevent a court from finding grounds for termination as a result of a failure to rectify conduct or conditions. *In re Q.D.D.*, 144 S.W.3d 856, 861 (Mo.App.2004). *See In re C.M.K.*, 140 S.W.3d 219, 225 (Mo.App. 2004). In particular, a court may find grounds for termination even when a parent has consistently had hourly, weekly visitation with an infant and supplied toys and clothes. *In re A.H.*, 9 S.W.3d 56, 60 (Mo.App.2000).

Mother made no progress complying with the provisions of the plan or using the services provided by DFS to address her daily marijuana use. Although mother

completed a residential drug treatment program, she did not seek aftercare for her drug abuse and relapsed. Mother testified that she understood the biggest obstacle to reunification with the child was her drug use. However, two and a half years after the child was taken into protective custody, mother still continued to smoke marijuana on a daily basis and claimed to be chemically dependent upon marijuana. She testified that only strong anti-depression or anti-anxiety medication would help her end her marijuana use, but she did not take the medication prescribed or attend counseling sessions to help her with depression and anxiety.

Mother failed to successfully or continuously participate in the individual counseling ordered by the service plan, although DFS provided her with three different therapists to her, and she acknowledged that she was diagnosed as suffering from depression and that she would need more counseling before the child could be returned to her.

 The service plan had ordered mother to obtain appropriate housing, and although DFS had provided her with housing referrals, she did not obtain appropriate housing until January, 2004, a few months before trial. Failure to obtain adequate housing as required by the service plan is behavior or a circumstance that poses a threat of harm to a child and can support termination. *E.T. C.*, 141 S.W.3d at 50; *K.D.H.*, 871 S.W.2d at 657.

 Further, and important in this case, failure to rectify a chemical dependency is a condition or behavior that poses a threat of harm to a child and can support termination. *In Interest of S.H.*, 915

treatment program, she continues to abuse marijuana, and has failed to engage in aftercare for the drug treatment or seek additional

drug treatment. The mother admitted that she had a chemical dependency."

S.W.2d 399, 403–05 (Mo.App.1996); *In Interest of J.M.L.*, 917 S.W.2d 193, 196 (Mo. App.1996). Mother had an admitted, daily drug habit that persisted up until the hearing. Her failure to take advantage of the drug treatment services offered and to take advantage of the counseling offered to treat her underlying depression, and that she herself acknowledged would be needed for her to have permanent custody of the child, is clear, cogent and convincing evidence ·of a failure to rectify under the statute. A lack of effort to comply with the plan and lack of success despite effort can predict future problems. *K.A.W.*, 133 S.W.3d at 10. Mother's lack of success in completing the drug abuse services provided or referred to her support the finding that mother has not made progress in complying with parts of her service plan nor has adjusted her circumstances to provide a proper home for the child, in spite of continuing aid by DFS.

The clear, cogent, and convincing evidence supports the trial court's decision· to terminate her rights for failure to rectify on the ground that she did not make progress in complying with the terms of the service plan. *S.H.*, 915 S.W.2d at 405; *K.D.H.*, 871 S.W.2d at·657; *In Interest of J.M.*, 815 S.W.2d 97, 103 (Mo.App.1991). The clear, cogent, and convincing evidence likewise supports termination for mother's failure to utilize the services provided by DFS on a continuing basis to adjust her circumstances and conduct to provide a proper home for the child.

## Father—Findings and Evidence

The trial court also examined father's compliance with his service plan. The trial court found that father consistently visited the child, made financial contributions to the child's support, underwent a psychological evaluation and some individual counseling. However, it also found that he failed to participate in a drug and alcohol evaluation, did not obtain drug and alcohol screenings, failed to complete parenting classes, and sporadically participated in individual counseling. It found that although he was provided anger management counseling, his conduct towards mother and the court demonstrated that he "failed to ·utilize the knowledge and techniques of anger management which may have been provided through the counseling." With respect to subsection (b), it found that·father has failed on a continuing basis since October 15, 2001, to adjust his circumstances or conduct to provide a proper home for the child in spite of the diligent, reasonable, and continuing efforts of the DFS to assist him.[4]

The evidence also supports the trial court's findings with respect to father. We have already summarized the conditions that led to the assumption of jurisdiction in our discussion of mother. In addition, DFS also determined that father's family home, where father then lived, was not a suitable placement for the child.

We next look at whether conditions of a potentially harmful nature continue to exist. In this regard we consider the extent

---

4. ·With respect to subsection (c), it found that father did not suffer from any mental condition that could not be reversed and that rendered him unable to knowingly provide the necessary care, custody, and control of the child.

With respect to subdivision (d), it found:
There was no evidence presented that the named and/or natural father suffers from a chemical dependency which prevents him from consistently providing the necessary care, custody and control for the child except that the named and/or natural father has failed and refused to engage in service designed to assess his substance abuse issues, including a drug and alcohol assessment and random drug screens. The named and/or natural father's positive drug screen obtained early in the proceedings indicated the need for further assessment.

to which father made progress complying with the terms of his service plan and in adjusting his circumstances and conduct to provide a suitable home for the child. Like mother, father also complied with the visitation and support provisions of his plan. However, DFS provided father with referrals for all of the services set out in his written service plan, including drug screens, two individual therapists, two parenting classes, housing, and a psychological evaluation, but father did not utilize these services. A lack of effort to comply with the plan and lack of success despite effort can predict future problems. *K.A.W.*, 133 S.W.3d at 10.

Father made no effort to comply with the provisions of the plan designed to identify and treat any drug use. Although there was evidence that father also used marijuana, DFS was not able to verify this because father never completed a substance abuse evaluation and completed only two of the 27 drug screens requested, one of which was positive for marijuana.

Father likewise made no progress in complying with the provision of the plan requiring him to obtain and maintain housing. Father had lived intermittently with his parents, friends, co-workers, and sister and had been homeless over the two and a half years after he entered into the service plan. Failure to maintain stable housing is a behavior or condition that poses a threat of harm to a child that can support termination. *J.M.L.*, 917 S.W.2d at 196; *A.H.*, 9 S.W.3d at 60. He testified he had obtained a trailer a few months before trial, however, he did not notify DFS that he had purchased a trailer until the day before trial, when it could not be verified. In the context that the child was in DFS custody for two and a half years while father did not have stable housing, the court could have minimized or rejected this testimony. *In Interest of R.R.T.*, 744

S.W.2d 829, 833 (Mo.App.1988). Father's failure to maintain any stable or appropriate housing over the two and a half years prior to the hearing, failure to take parenting classes, and failure to obtain drug screens and services indicates an inability to provide a stable home and proper care and custody for the child.

Further and most importantly, father had no success addressing his problem with anger management. There was evidence of domestic violence between him and mother. Father was required to obtain anger management counseling, but he failed to attend counseling sessions consistently, with lengthy gaps in his treatment. Further, father's own disruptive behavior at the termination hearing showed that he had made no progress with respect to controlling his anger. Inability to manage anger is a serious behavior or condition that poses a threat of harm to a child that can support termination. *In re J.K.*, 38 S.W.3d 495, 503 (Mo.App.2001).

By not taking advantage of the services offered, father failed to follow his service plan or to adjust his conduct and circumstances necessary to permit reunification with the child. Because father did not take advantage of the reasonable efforts and referrals made on the part of DFS over the past two years, it is not reasonable that further efforts by DFS would enable him to be reunited with the child.

The clear, cogent, and convincing evidence supports the trial court's decision to terminate father's parental rights for failure to rectify on the ground that he did not make progress in complying with the terms of the service plan. The clear, cogent, and convincing evidence likewise supports the termination of father's rights for his failure to use DFS services on a continuing basis to adjust his circumstances and conduct to provide a proper home for the child.

## II. *Best Interests of the Child*

■ Because the court's findings under section 211.447.4(3) are supported by clear, cogent, and convincing evidence, termination is proper if it is in the child's best interests. *E.L.B.*, 103 S.W.3d at 776. Neither mother nor father challenged the trial court's finding that termination was in the best interest of the child in any of their points relied on. However, in the argument section under their challenges to the trial court's findings under 211.447.4(2), both dispute the court's analysis under 211.446(1), (4), (5), and (7). We ordinarily will not reach the merits of arguments not encompassed by a point relied on, *In re R.T.T.*, 26 S.W.3d 830, 835 (Mo.App.2000), but because of the nature of the right at stake, we will exercise discretion to address this argument.

■ Under section 211.447.5, in addition to the finding that a statutory ground for termination exists, the trial court must find that termination is in the best interests of the child. *E.L.B.*, 103 S.W.3d at 776. Section 211.447.6(1)-(7) identifies seven factors to be used in making a best interests determination. *K.A.W.*, 133 S.W.3d at 19.

Mother and father challenge the trial court's findings under subsections (1), (4), (5) and (7) of section 211.447.6, as set out in paragraphs 7a., d., e., and g. of its judgment:

7.a. [The child] has demonstrated some emotional ties to his Mother, in that he recognizes her as a ·mother figure and enjoys his visits with her, however, the emotional ties which do exist do not warrant continuation of the parent/child relationship due to his need for permanency and the Mother's failure to meet that need. [The child] has demonstrated some emo-tional ties to his named and/or natural father, in that he recognizes him as a father figure and enjoys his visits with him, however, the emotional ties which do exist do not warrant continuation of the parent/child relationship due to his need for permanency and the Father's failure to meet that need.

\* \* \*

d. Based on the evidence presented, the Court finds there is reasonable cause to believe that additional services would not likely bring about lasting adjustments by Mother so as to enable a return of the child to her within an ascertainable time. Based on the evidence presented, the Court finds there is reasonable cause to believe that additional services would not be likely to bring about lasting adjustments by the named and/or natural father, so as to enable a return of the child to him within an ascertainable time.

e. Mother has shown an interest in the child. However, mother's failure to successfully complete services provided to her by the Children's Division demonstrates a lack of commitment to her child. Named and/or natural father has shown an interest in the child. However, father's failure to successfully complete services provided to him by the Children's Division demonstrates a lack of commitment to his child.

\* \* \*

g. Neither mother nor father has committed any severe or recurrent acts of physical, emotional or sexual abuse toward this child or any other child in the family, nor did any other person commit any severe or recur-

rent acts of physical, emotional or sexual abuse toward this child or any other in the family under circumstances indicating that the mother or father knew or should have known of the act, except that the child was seriously physically abused by an unknown perpetrator while in the care and custody of his parents which led to his removal from their custody in August 2001.

"The determination of what is in a child's best interests is an ultimate conclusion for the trial court based on the totality of the circumstances." *In re D.L.W.*, 133 S.W.3d 582, 585 (Mo.App.2004) (quoting *In re K.J.K.*, 108 S.W.3d 62, 68 (Mo.App.2003). "It is a subjective assessment of evidence that is not reweighed by appellate review.") *Id.* Accordingly, we review a best interests determination for abuse of discretion. *Id.*

"[T]he best interests of the child takes priority over reunification." *S.H.*, 915 S.W.2d at 405. Termination has been held to be in the best interests of the child where the child has spent the better portion of the child's life in the custody of others, where the parents have failed to improve their conduct to regain custody of their child, where the child has shown little emotional ties to the parents, and where adoption would be more difficult the longer the child remains in temporary foster care. *Id.*

The child was removed from his parents' care at one month of age and has been in foster care continuously for two and a half years. The child is adoptable and adoptive homes are available to him. Mother and father had two and a half years to work towards reunification with the child. Although they maintained visitation with the child and the court found the child had some emotional ties to them, they were unsuccessful in making progress with provisions in their service plans designed to reduce or eliminate the potential that their conditions and behavior would harm the child. "While it is clear that [parents] wanted a continuing relationship with [the child], the court could well find that it was not in [the child's] best interests to live indefinitely in foster care. It could have found, and did find, that it was in [the child's] best interests to get into a permanent living situation and to have a chance at adoption by someone who could provide [him] with the care [he] needed." *J.K.*, 38 S.W.3d at 502. Under these circumstances, the trial court did not abuse its discretion in finding that termination was in the child's best interests on the basis of the child's need for permanency, the parents' failure to meet that need for permanency, the court's finding that there is no reasonable cause to believe additional services would bring about lasting adjustments by either parent, and the parents' failure to demonstrate a commitment to the child by successfully completing the services provided to them. *See J.A.A.*, 829 S.W.2d at 83.

### III. *Section 211.447.4(2) Findings*

Mother and father both challenge the trial court's findings supporting termination under section 211.447.4(2). Because the trial court's findings under Section 211.447.4(3) are supported by clear, cogent, and convincing evidence and are in the best interests of the child, it is unnecessary to consider mother's and father's challenges to findings under sections 211.447.4(2). *In re N.L.B.*, 145 S.W.3d 902, 906 (Mo.App.2004).

The judgments of the trial court are affirmed.

PATRICIA L. COHEN, P.J. and ROBERT G. DOWD, JR., J., concur.